UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. ..  :
PRISON LEGAL NEWS, a project of the            :
HUMAN RIGHTS DEFENSE CENTER, a                 :
Washington not-for-profit organization         :
                                               :
                Plaintiff,            :
                                               :
       vs.                                    :    Civil Action No. 5:15cv00061
                                               :
NORTHWESTERN REGIONAL JAIL                     :
AUTHORITY, NORTHWESTERN REGIONAL               :
ADULT DETENTION CENTER, JAMES F.               :
WHITLEY, individually and in his official capacity :
as Superintendent, CLAY CORBIN, individually   :
and in his official capacity as Captain, DOES 1-10, :
in their individual                            :
and official capacities,                       :
                                               :
                Defendants.           :
                                               :
.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. ..  :

---

PLAINTIFF'S MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

---

Jeffrey E. Fogel, VSB #76345
Steven D. Rosenfield, VSB #16539
913 E. Jefferson Street
Charlottesville, VA 22902
(434) 984-0300 (Tel)
(434) 220-4852 (Fax)
Email: jeff.fogel@gmail.com
Email: attyrosen@aol.com

Lance Weber, Fla. Bar # 104550
*Pro Hac Vice* Motion to Be Filed
Sabarish Neelakanta, Fla. Bar #: 26623
*Pro Hac Vice* Motion to Be Filed
Human Rights Defense Center
PO Box 1151
Lake Worth, FL 33460
(561) 360-2523
lweber@humanrightsdefensecenter.org
sneelakanta@humanrightsdefensecenter. org

## INTRODUCTION

Defendants are in violation of the free speech and due process clauses of the First and Fourteenth Amendments to the U.S. Constitution by improperly censoring books and magazines mailed to prisoners at Northwest Regional Adult Detention Center (hereinafter, "NRADC") from Plaintiff, PRISON LEGAL NEWS, a project of the Human Rights Defense Center (hereinafter "PLN"; or "Plaintiff") and other senders.

PLN hereby moves for a preliminary injunction enjoining Defendants from continuing to enforce their illegal mail policy, and from continuing to deprive senders of censored mail of their rights to due process of law. A preliminary injunction should be granted because PLN will succeed on the merits of this action, because the violations of PLN's constitutional rights are causing irreparable harm, because the balance of equities strongly weighs in PLN's favor, and because an injunction would be in the public interest.

## FACTUAL BACKGROUND

Prison Legal News is a project of the non-profit Human Rights Defense Center. PLN publishes an award-winning, 72-page monthly journal entitled *Prison Legal News*. Declaration of Paul Wright in Support of Motion for Preliminary Injunction ("Wright Decl."), ¶¶3,4. The journal provides information about legal issues, including access to courts, disciplinary hearings, prison and jail conditions, excessive force, and religious freedom. *Id.* ¶5. Published continuously since 1990, *Prison Legal News* has thousands of subscribers in the United States and abroad, including prisoners, attorneys, journalists, public libraries, judges, and the general public. *Id.* ¶4. PLN is distributed to prisoners in more than 2,400 correctional facilities across the United States, including detainees at NRADC. *Prison Legal News* is also distributed to approximately ninety-five (95) prisoners housed among the 38 adult facilities run by the Virginia Department of Corrections, as well as to subscribers in death row units and "Supermax" prisons, including the Red Onion State Prison in Pound, Virginia, the federal maximum-security United State

2
Case 5:15-cv-00061-EKD-JCH   Document 8   Filed 09/23/15   Page 2 of 18   Pageid#: 143

Penitentiary Lee in Jonesville, Virginia, and the federal Administrative Maximum Facility ("ADX") at Florence, Colorado, the most secure prison in the United States. *Id*.

PLN also distributes approximately fifty (50) legal and self-help softcover books, including *The Habeas Citebook: Ineffective Assistance of Counsel* ("*Habeas Citebook*"), which describes the procedural and substantive complexities of Federal *habeas corpus* litigation, and *Protecting Your Health and Safety* "(*PYHS*"), which explains the basic rights of U.S. prisoners with regard to communicable diseases, abuse, and other health and safety related issues. *Id.* ¶¶ 7, 11, 12, 13. The core of PLN's mission is public education, advocacy and outreach to assist prisoners who seek legal redress for infringements of their constitutional and human rights. *Id.* ¶ 2.

Defendants have censored the following materials from PLN: (1) issues of the monthly journal, *Prison Legal News*; (2) individual softcover copies of *Habeas Citebook*; and (3) individual softcover copies of *PYHS*. *Id.* ¶11. Altogether, since July 2014, Defendants have censored PLN's monthly journal and books on at least 211 occasions. *Id.* ¶11. Restricting the speech of PLN and other senders of censored mail is not rationally related to a legitimate penological interest. This violates PLN's First Amendment right to communicate its speech with prisoners. Additionally, no notice of the censorship or opportunity to appeal was given to PLN when any of the monthly issues of *Prison Legal News* were not delivered to the intended prisoners in violation of PLN's Fourteenth Amendment right to due process of law. *Id.* ¶14. All copies of *Habeas Citebook* and *PYHS* were returned, at PLN's expense, with terse markings on the outside of the package stating: "**REFUSED: Per Jail Policy**;" or with no markings whatsoever. *Id.* ¶¶12, 13. No option to appeal the decision was provided to PLN, nor was there any further explanation as to the reasons for the censorship. *Id.* ¶14.

Defendants' illegal conduct stems from an unconstitutional mail policy which prohibits all books and magazines from entering "the [Jail] through the mail, directly from the publisher, or from a distribution source," that went into effect on April 1, 2014. *Id.* ¶10. Shortly after instituting the new mail policy, Defendants collected all books and magazines from within the

3

Jail, and informed all prisoners that "no books or packages will be authorized through the mail." *Id.* ¶10, Exhibit 2.

## ARGUMENT

By adopting and applying a mail policy and practice that censors PLN and other senders' books and magazines to prisoners in NRADC, and by doing so without due process, Defendants are illegally interfering with protected expression and chilling future speech. Unless enjoined by this Court, Defendants' policies and practices will continue to violate the free speech rights of senders of censored mail in the future and will do so without due process, causing irreparable harm. For the reasons explained below, Plaintiff respectfully moves the Court to enter a preliminary injunction that prohibits the Defendants from continuing to violate Plaintiff and other senders' constitutional rights.

### I. LEGAL STANDARD

A preliminary injunction is appropriate where a plaintiff demonstrates (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; (2) the likelihood of harm to the defendant if the requested relief is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest. *Ciena Corp. v. Jarrard*, 203 F.3d 312, 322 (4th Cir. 2000) (citing *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189, 193-94 (4th Cir. 1977)) (internal quotation marks and citations omitted); *see also* FED. R. CIV. P. 65(a).

### II. PLN IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

#### A. <u>First Amendment Claims</u>

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution," *Turner v. Safley*, 482 U.S. 78, 84 (1987). Moreover, prisons and jails cannot bar free citizens from exercising their own constitutional rights by reaching out to those on the "inside." *Turner, supra* at 94-99; *Thornburgh v. Abbott*, 490 U.S. 402, 408 (1989) ("[T]here is no

4

question that [third parties] who wish to communicate with those who . . . willingly seek their point of view have a legitimate First Amendment interest in access to prisoners."); *Montcalm Pub. Corp. v. Beck*, 80 F.3d 105, 108-09 (4th Cir. 1996) ("The Supreme Court has clearly recognized a First Amendment interest in those who wish to communicate with prison inmates . . . ."). A "blanket prohibition against receipt of the publications by any prisoner carries a heavy presumption of unconstitutionality." *Pepperling v. Crist*, 678 F.2d 787, 791 (9th Cir. 1982).

PLN's correspondence with prisoners is "core protected speech" and "occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal citation omitted); *see also Prison Legal News v. Cook*, 238 F.3d 1145, 1149 (9th Cir. 2001) ("[PLN's speech] is core protected speech, not commercial speech or speech whose content is objectionable on security or other grounds."); *Pell v. Procunier*, 417 U.S. 817, 830 n.7 (1974) ("[T]he conditions in this Nation's prisons are a matter that is both newsworthy and of great public importance.").

To withstand First Amendment scrutiny, a prison policy must be "reasonably related to legitimate penological interests" under the four "*Turner*" factors:

> (1) whether the regulation is rationally related to a legitimate and neutral governmental objective; (2) whether there are alternative avenues that remain open to the inmates to exercise the right; (3) the impact that accommodating the asserted right will have on other guards and prisoners, and on the allocation of prison resources; and (4) whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials.

*Turner*, 482 U.S. 78 at 89. While this case involves the free speech rights of free persons, and not of prisoners, for purposes of this motion, PLN assumes that the Court will employ the *Turner* test as a means of ensuring that any injunctive relief incorporates due deference for the exigencies of jail operation.

5

First, under *Turner*, "there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Id*. at 89. The first factor is "*sine qua non*: if the prison fails to show that the regulation is rationally related to a legitimate penological objective, [the Court] do[es] not consider the other factors." *Ashker v. Cal. Dep't of Corr.*, 350 F.3d 917, 922 (9th Cir. 2003); *see also Cook*, *supra*, 1151 (9th Cir. 2001) (concluding that mail restriction was not rationally related to a legitimate penological objective and declining to consider the other *Turner* factors). Under this prong, "the 'logical connection between the regulation and the asserted goal' must not be 'so remote as to render the policy arbitrary or irrational,' and the governmental objective must be both 'legitimate and neutral.'" *Frost v. Symington*, 197 F.3d 348, 354 (9th Cir. 1999) (*quoting Turner*, 482 U.S. at 89-90).

Although respectful of correctional officials' expertise, *Turner's* "reasonableness standard is not toothless." *Thornburgh*, 490 U.S. at 414. When a plaintiff presents evidence to refute a "common-sense connection" between a legitimate objective and a prison policy, the defendant "must present enough counter-evidence to show that the connection is not so remote as to render the policy arbitrary or irrational." *Frost*, 197 F.3d at 357.

> Prison authorities cannot rely on general or conclusory assertions to support their policies. Rather, they must first identify the specific penological interests involved and then *demonstrate* both that these specific interests are *the actual bases* for their policies and that the policies are reasonably related to the furtherance of the identified interests. An *evidentiary showing* is required as to each point.

*Walker v. Sumner,* 917 F.2d 382, 286 (9th Cir. 1990) (emphasis added). The government may not pile "conjecture upon conjecture" to justify infringement of constitutional rights. *Reed v. Faulkner*, 842 F.2d 960, 963-964 (7th Cir. 1998); *see also Beard v. Banks*, 548 U.S. 521, 533 (2006) (plurality opinion) ("The real task . . . is not balancing these factors" but assessing whether the record shows a reasonable, not just logical, relationship); *Shakur v. Schriro*, 514 F.3d 878, 891

6

(9th Cir. 2008) (reversing district court decision dismissing claim because it "applied the wrong standard of review, substituting mere rational basis review for the four-part balancing test required by *Turner*"); *DeHart v. Horn*, 227 F.3d 47, 59 (3d Cir. 2000) ("*Turner* does not call for placing each factor in one of two columns and tallying a numerical result. . .*Turner* does contemplate a judgment by the court regarding the reasonableness of the defendants' conduct under all of the circumstances reflected in the record") (*en banc*); *Campbell v. Miller*, 787 F.2d 217, 227 n.17 (7th Cir. 1986) ("[D]eference to the administrative expertise and discretionary authority of correction officials must be schooled, not absolute."); *Cline v. Fox*, 319 F.Supp.2d 685, 692 n.5 (N.D.W.Va. 2004) (noting that under Supreme Court and Fourth Circuit precedent, "the legitimate objective/rational relationship test may be outcome determinative."); *Williams v. Pryor*, 240 F.3d 944, 950 (11th Cir. 2001) ("Although similar in part (and sometimes in description) to ordinary rational basis review, the *Turner* standard requires a more searching, four-part inquiry.")

As evidenced below, PLN is highly likely to prevail on each of the *Turner* factors with regard to the censorship experienced by PLN.

    1.    <u>The Defendants' Policy and Practice Bears No Rational Relation to Legitimate Penological Objectives</u>

The first factor a court considers in determining the validity of a prison regulation is whether there is "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner,* 482 U.S. at 89–91. An analysis of the traditional justifications to restrict First Amendment rights – security and/or safety concerns and inmate rehabilitation – demonstrates that the censorship at issue here is not related to a legitimate penological objective. In short, as described in more detail below, courts in this circuit have repeatedly held that potential security or safety concerns simply do not justify censorship of all books regardless of form or content, and have found that restricting access to such material

actually impedes inmate rehabilitation. As a result, there can be no rational relationship between Defendants' regulation censoring all books and any potential interest put forward to justify it.

    2.    <u>Security and/or Safety Concerns Do Not Justify Censorship of Books</u>.

Maintenance of security and discipline do not justify the wholesale prohibition of pictorial magazines, books or newspapers. *Kincaid,* 670 F.2d at 744 (7th Cir. 1982). Accordingly, a jail may not institute wholesale exclusion of the types of publications inmates may receive (*e.g.* all magazines or all books) because wholesale bans are neither limited to publications actually warranting censorship nor do they offer publishers like PLN an alternative means to exercise their First Amendment rights. In cases involving the mail policies of both prisons and jails, several circuits have issued injunctions halting wholesale bans. *See e.g., Jacklovich v. Simmons*, 392 F.3d 420, 428 (10th Cir. 2004) (reversing grant of summary judgment for defendant under *Turner* in case involving ban on gift subscriptions and alternative special purchase program); *Prison Legal News v. Lehman*, 397 F.3d 692, 699-700 (9th Cir. 2005) (prison's ban on non-subscription bulk mail and catalogs unconstitutional); *Mann v. Smith*, 796 F.2d 79, 82 (5th Cir. 1986) (county jail's policy of banning newspapers and magazines violated pretrial detainee's First Amendment rights); *Kincaid v. Rusk*, 670 F.2d 737, 744 (7th Cir. 1982). No rational relationship exists between a blanket ban on books and any legitimate penological goal.

    3.    <u>Censorship of Books and Magazines Hinders Rehabilitation.</u>

NRADC's censorship of PLN's books and magazines hampers the penological objective of rehabilitation for those imprisoned after conviction of a crime. The Supreme Court has recognized that the "weight of professional opinion seems to be that inmate freedom to correspond with outsiders advances rather than retards the goal of rehabilitation…" *Martinez*, 416 U.S. 396, 412-13 (1974) (overruled in part on other grounds by *Thornburgh*, 490 U.S. 401 (1989). While there is nothing

8

problematic about attempting to improve a prisoner's behavior - since rehabilitation is one of the primary purposes of incarceration – the Supreme Court has said that the ordinary meaning of "rehabilitation" is preparation for release back into society. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 351 (1987); *see also McKune v. Lile*, 536 U.S. 24, 36 (2002) (rehabilitation is the objective of the corrections system because "most offenders will eventually return to society.").

As such, it is difficult to see how "depriving a prisoner of nearly all knowledge about the outside world could help prepare the prisoner for his eventual return to that world. Indeed:

> Constructive, wholesome contact with the community is a valuable therapeutic tool in the overall correctional process…Correspondence with members of an inmate's family, close friends, associates and organizations is beneficial to the morale of all confined persons and may form the basis for good adjustment in the institution and the community.

*Martinez*, 416 U.S. at 412 n. 13 (*quoting* Policy Statement 7300.1A of the Federal Bureau of Prisons and Policy Guidelines for the Association of State Correctional Administrators).

Education during incarceration is widely recognized as "a path to increased employment, reduced recidivism, and improved quality of life." "From the Classroom to the Community: Exploring the Role of Education during Incarceration and Reentry," The Urban Institute Justice Policy Center (2009), at 2. The Bureau of Prisons notes that:

> Research demonstrates that education can change thinking, encourage pro-social behavior, increase employment, and reduce recidivism. Education's power to transform lives in both tangible and intangible ways makes it one of the most valuable and effective tools we may have for helping people rebuild their lives after incarceration, as well as for combating and reducing criminal justice costs.

*Id.* at 42. In this way, NRADC's censorship of PLN's books and magazines is not only arbitrary, it is harmful as well. The books and magazines distributed or published by PLN facilitate the exchange of information on jail conditions and legal rights, and on how to address medical, psychological, and educational needs. The censorship severely impedes these prisoners and

9

detainees' ability to educate themselves during incarceration, and thus retards the penological goal of rehabilitation. Moreover, for pre-trial detainees, the government does not have any interest in punishment or rehabilitation, but must simply hold these prisoners until the charges pending against them have been resolved. For prisoners such as these, the government's censorship of books intended for their use is even more outrageous.

  4. <u>Defendants Have Failed to Provide Alternative Means of Exercising PLN's First Amendment Rights.</u>

The second *Turner* factor is whether there exists alternative means to exercising the constitutional right in question. The Supreme Court has made it clear that the absence of such alternative means may be seen as evidence that the prison regulations in question are unreasonable. *Beard v. Banks*, 548 U.S. 521, 532 (2006) (*citing Overton v. Bazzetta*, 539 U.S. 126, 135 (2003) (holding that "no alternative means of communication" is "some evidence" that the prison regulations at bar were "unreasonable.")).

Here, the NRADC's censorship of PLN's books and magazines bars any alternative means of exercising its constitutional rights. PLN cannot effectively or reasonably be expected to communicate its written speech by telephone or in-person. Nor are other forms of written communication available to PLN. Indeed, the continued censorship of its books and magazines demonstrates that Defendants will squelch any effort by PLN to deliver the information contained in its publications via some other printed form. In short, Defendants have left PLN with no practical way to reach its intended audience.

Nor should access to television, radio, or some other form of communication be seen as an adequate alternative to reading PLN's books. Rather, as the Supreme Court noted in *Pell v. Procunier*, courts should apply the principle that "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological

10
Case 5:15-cv-00061-EKD-JCH   Document 8   Filed 09/23/15   Page 10 of 18   Pageid#: 151

objectives of the corrections system." *Procunier*, 417 U.S. 817, 822 (1974); *see also Banks*, 548 U.S. at 543 ("the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge."); *Mann v. Smith*, 796 F.2d 79, 83 (5th Cir. 1986) (noting that "whatever the intrinsic merits of television in comparison with newspapers and magazines, the contents of television are different from what one finds in the printed media," and holding that Plaintiff's constitutional rights were violated where the Midland County Sheriff denied him access to newspapers and magazines but allowed access to television). In short, it is not for Defendants to decide whether television, radio, or some other form of communication can adequately serve the First Amendment right to receive protected materials.

     5.     <u>Accommodating PLN's First Amendment Rights Would Impose No Significant Burden on Jail Officials</u>.

The third *Turner* factor is the effect an accommodation of the constitutional right in question will have on inmates, prison staff, and on resource allocation. *Turner*, 482 U.S. at 90. In this context, the Supreme Court has said that "the policies followed at other well-run institutions [are] relevant to a determination of the need for a particular type of restriction." *Martinez*, 416 U.S. 398, 414 n. 14 (1974) (overruled in part on other grounds by *Thornburgh*, 490 U.S. 401 (1989)). In other words, the fact that other institutions are effectively able to accommodate the constitutional right in question is good evidence that a particular restriction is not necessary.

Since its founding in 1990, *Prison Legal News* has sent its materials to thousands of prisoners nationwide. PLN distributes its books to correctional facilities across the United States, including the Virginia Department of Corrections and the Federal Bureau of Prisons, which houses over two hundred thousand inmates, without censorship. Notably, PLN is not aware of any state or federal prison where PLN's books have created a security concern. Wright Decl. ¶8. This is strong evidence that the third *Turner* factor favors PLN.

11

6. **Defendants' Policy is an Exaggerated Response to Perceived Security Concerns.**

The final *Turner* factor is whether the regulation in question is an exaggerated response to prison concerns. *Turner*, 482 U.S. at 90. Here, "the existence of obvious, easy alternatives" may be seen "as evidence that the regulation is not reasonable." *Id*. More importantly, when a court finds that a restriction on a prisoner's First Amendment rights is an "exaggerated response" to any legitimate concerns, the restriction cannot stand. *Turner*, 482 U.S. at 91. Again, as mentioned above, the fact that thousands of correctional facilities nationwide accept PLN's materials strongly suggest that NRADC's censorship is an exaggerated response.

Furthermore, while it is true that the final *Turner* factor is not a "least restrictive alternative test" where prison officials have to "set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional [rights]," here Defendants have provided no alternatives whatsoever. *Turner*, 482 U.S. 78, 90-91 (1987).

**B.    Defendants have Violated Due Process by Failing to Provide PLN with Adequate Notice and an Opportunity to Challenge Defendants' Censorship.**

A publisher's right to communicate with prisoners is rooted not only in the First Amendment, but also protected by the Fourteenth Amendment as:

> the decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards. The interest of prisoners and their correspondents in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a "liberty" interest within the meaning of the Fourteenth Amendment even though qualified of necessity by the circumstance of imprisonment. As such, it is protected from arbitrary governmental invasion . . .

*Martinez*, *supra*, 416 U.S. at 417-18. In *Martin v. Kelley*, the Sixth Circuit held that a prison mail censorship regulation must provide notice and an opportunity to appeal to both the inmate and the sender because:

> Without notifying the free citizen of the impending rejection, he would not be able to

> challenge the decision which may infringe his right to free speech . . . [and] since the inmate-recipient would not have seen the contents of the withheld letter, he may require the aid of the author to meaningfully challenge the rejection decision.

803 F.2d 236, 244 (6th Cir. 1986). *See also Jacklovich,* 392 F.3d at 428; *Montcalm Pub. Corp. v. Beck*, 80 F.3d 105, 109 (4th Cir. 1996); *Cafone v. Manson*, 409 F.Supp. 1033, 1042 (D. Conn. 1976).

The Constitution requires prison officials to afford notice and an opportunity to appeal their censorship decisions. *See, e.g., Martinez*, *supra*, 416 U.S. at 418-19 (requiring "that an inmate be notified of the rejection of a letter written by or addressed to him, that the author of that letter be given a reasonable opportunity to protest that decision, and that complaints be referred to a prison official other than the person who originally disapproved the correspondence."). Defendants, however, failed to provide constitutionally mandated due process to publishers and other senders of prisoner mail. PLN's books and magazines were never provided to prisoners, and no notice of the censorship or opportunity to appeal was afforded to PLN. As discussed *supra*, magazines were never returned or delivered, and books were returned to PLN, at its expense, containing terse markings on the outside of the package ("**REFUSED: Per Jail Policy**"), or no markings whatsoever. In either case, Defendants provided no opportunity to appeal the censorship. Also, by returning censored items to the sender without a hearing, NRADC no longer has the material to review if any sender or prisoner were to contest the rejection. Further, providing notice and an opportunity to be heard is important because it allows publishers to investigate and to challenge violations of their First Amendment rights, and assist subscribers in filing challenges to such violations within the correctional grievance system. *See Montcalm Publ. Corp. v. Beck,* 80 F.3d 105, 108-109 (4th Cir. 1996) (stating that notice to the prisoner alone is insufficient because "[a]n inmate who

cannot even see the publication can hardly mount an effective challenge to the decision to withhold that publication."). Equally important is that by affording an appeals process, courts are able to evaluate the propriety of the censorship at the time it happens. Additionally, correctional facilities in other jurisdictions provide due process to senders and prisoners when refusing to deliver publications and other correspondence. The Federal Bureau of Prisons has an explicit policy requiring it to notify prisoners and publishers, identifying the specific articles or materials rejected and allowing independent review of a warden's rejection decision. *See Thornburgh*, *supra,* 490 U.S. at 406. This policy was upheld by the United States Supreme Court and acts as a model for other correctional facilities. *Id.*

### III. PLN WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF INJUNCTIVE RELIEF.

The Supreme Court has held that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Courts have repeatedly found irreparable harm based on the denial of First Amendment rights in correctional settings. *See, e.g., See, e.g., Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009) (affirming grant of preliminary injunction against prison publication policy) (*quoting Elrod*, 427 U.S. at 373); *Prison Legal News v. Lehman*, 397 F.3d 692, 699-700 (9th Cir. 2005) (permanent injunction of WA DOC no catalog, no bulk rate mail policies); *Prison Legal News v. Cook*, 238 F.3d 1145, 1151 (9th Cir. 2001) (concluding that mail restriction was not rationally related to a legitimate penological objective and declining to consider the other *Turner* factors); *Mann v. Smith*, 796 F.2d 79, 82 (5th Cir. 1986) (county jail's policy of banning newspapers and magazines violated pretrial detainee's First Amendment rights); *Jacklovich,* 392 F.3d at 428 (10th Cir. 2004); *Kincaid,* 670 F.2d at 744 (7th Cir. 1982).

To meet its mission, PLN must deliver its publications and correspondence to inmates

14

quickly, by covering recent events and judicial decisions that—if delivery is delayed—may be stale upon arrival or may no longer be relevant to an inmate whose legal filing deadline has passed. *See CBS, Inc. v. Davis*, 510 U.S. 1315, 1318 (1994) ("[I]ndefinite delay of [a] broadcast will cause irreparable harm to the news media that is intolerable under the First Amendment."). If PLN loses the opportunity to deliver its materials to an inmate, it has lost the window of opportunity in which to communicate with that inmate at a time when the information will be most useful and effective. Furthermore, if Defendants are not ordered to provide notice of the materials they are refusing to deliver, PLN will not know which materials are allowed to enter Defendants' facilities and which materials are rejected.

## IV. THE BALANCE OF EQUITIES TIPS IN PLN'S FAVOR.

Here, the irreparable harm suffered by PLN is concrete, severe, and ongoing. Defendants will continue to censor PLN's books and magazines to prisoners without due process, banning PLN's core protected speech on government policies, prisoner rights, jail conditions, and the criminal justice system. Presumably, other publishers have been or will be censored in the same way. In contrast, any potential injuries to the Defendants are minimal and speculative. No great cost or expenditure of time is required to lift the policies to allow PLN to deliver its books to prisoners and afford constitutionally required due process. Accordingly, the balance of equities tips in PLN's favor given the irreparable harm suffered by PLN if a preliminary injunction does not issue.

## V. A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST.

The First Amendment furthers a compelling public interest. "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Once again, "the

15

determination of where the public interest lies also is dependent on a determination of the likelihood of success on the merits of the First Amendment challenge because it is always in the public interest to prevent the violation of a party's constitutional rights." *Connection Distribution Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (internal citations omitted). *See also Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (Courts have "consistently recognized the 'significant public interest' in upholding free speech principles," quoting *Sammartano v. First Judicial Dist. Ct*., 303 F.3d 959, 974 (9th Cir. 2002)); *ACLU v. Reno*, 929 F. Supp. 824, 851 (E.D. Pa. 1996) ("No long string of citations is necessary to find that the public interest weighs in favor of having access to a free flow of constitutionally protected speech."). This inquiry "primarily addresses impact on non-parties rather than parties." *Sammartano*, 303 F.3d at 974. The public has an important interest in protecting the "marketplace of ideas" wherever it may be found, and in the continued vitality of the Bill of Rights. This speaks to the hunger for expressive freedom that Justice Thurgood Marshall described in *Martinez, supra,* 416 U.S. at 428 (Marshall, J., concurring) ("When the prison gates slam behind an inmate, he does not lose his human quality; his mind does not become closed to ideas; his intellect does not cease to feed on a free and open interchange of opinions…It is the role of the First Amendment and this Court to protect those precious personal rights by which we satisfy such basic yearnings of the human spirit.").

## VI. THE BOND REQUIREMENT SHOULD BE WAIVED.

Under Federal Rule of Civil Procedure 65(c), district courts have discretion to determine the amount of the bond accompanying a preliminary injunction, and this includes the authority to set no bond or only a nominal bond. *See Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) ("The court has discretion to dispense with the security requirement, or to

16

request mere nominal security, where requiring security would effectively deny access to judicial review.") (quoting *Cal. ex. rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985)); *Ctr. For Food Safety v. Vilsack*, 753 F. Supp. 2d 1051, 1061–62 (N.D. Cal. 2010) (waiving bond requirement for small non-profit organization suing government entity because bond would effectively deny access to judicial review). Waiving the bond requirement is appropriate here because PLN is a project of a small non-profit organization of fifteen employees that would be unable to post anything more than a nominal bond. Wright Decl. ¶17. A bond requirement would effectively deny access to judicial review for PLN, which is especially harmful because PLN is alleging violations of its fundamental rights under the Constitution. *See Complete Angler, LLC v. City of Clearwater*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009) ("Waiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right.").

## CONCLUSION

For the foregoing reasons, PLN respectfully requests that the Court enter an Order granting Plaintiff's Motion for a Preliminary Injunction and providing for other relief as is appropriate.

Respectfully submitted,

/s/Jeffrey E. Fogel
Jeffrey E. Fogel, VSB #76345
Steven D. Rosenfield, VSB #16539
913 E. Jefferson Street
Charlottesville, VA 22902
(434) 984-0300 (Tel)
(434) 220-4852 (Fax)
Email: jeff.fogel@gmail.com
Email: attyrosen@aol.com

Lance Weber
*Motion for Admission Pro Hac Vice to Be Filed*
Sabarish Neelakanta
*Motion for Admission Pro Hac Vice to Be Filed*
Human Rights Defense Center
PO Box 1151
 Lake Worth, FL 33460
(561) 360-2523
lweber@humanrightsdefensecenter.org
sneelakanta@humanrightsdefensecenter.org

Attorneys for Plaintiff

Dated: September 23, 2015