CLERKS OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

9/29/2017

JULIA C. DUDLEY, CLERK
BY:  s/ JODY TURNER
                DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

PRISON LEGAL NEWS,                )
                                  )
         Plaintiff,               )
                                  )
v.                                )         Civil Action No. 5:15-cv-00061
                                  )
NORTHWESTERN REGIONAL JAIL        )         By: Elizabeth K. Dillon
AUTHORITY, *et al.*,              )             United States District Judge
                                  )
         Defendants.              )

**MEMORANDUM OPINION**

This case involves constitutional challenges brought by publisher Prison Legal News

(PLN) after materials it sent to prisoners at the Northwestern Regional Adult Detention Center

(NRADC) were sent back to it at PLN's expense with a notation that they had been refused, per jail

policy.   The named defendants are the Northwestern Regional Jail Authority (NRJA), which runs

NRADC, jail superintendent James F. Whitley, and Captain Clay Corbin.[1]   Whitley was in charge

of all operations at the jail and approved the policy that PLN challenges; Corbin was the jail officer

tasked with implementing the policy.   After this suit was filed, the parties engaged in settlement

discussions.   They subsequently provided to the court two consent decrees, both of which were

entered by the court.   Those orders effectively granted the injunctive relief sought by PLN in this

suit.

Now pending before the court are cross-motions for summary judgment, in which the

parties disagree as to the remaining relief, if any, that the court should grant.   The motions raise a

number of distinct issues, including whether the prior consent decrees either establish legal

---

[1]   In addition to the three named defendants, the complaint also names John Does 1–10.   No answer has been
filed for the Doe defendants, and the parties do not address them in their summary judgment briefing.

liability or moot the requests for declaratory relief, whether the defendants are entitled to qualified immunity, whether the NRJA is entitled to Eleventh Amendment immunity, and whether, if the court were to reach the issue of damages, PLN is entitled to anything other than nominal damages. The motions are fully briefed and were argued before the court at a March 1, 2017 hearing. At the hearing, PLN conceded that Corbin is no longer an appropriate defendant because he was not the policy-maker and because the question of injunctive relief—for which he might have been a proper defendant—had been resolved. Thus, Corbin will be dismissed from the case per the agreement of the parties.

For the reasons discussed below, the court will grant in part and deny in part both motions for summary judgment.

## I. BACKGROUND

NRADC is a Virginia-accredited detention center. At the time of the depositions in this case, it housed approximately 650 prisoners, although the numbers have exceeded 725, and were as low as 550 when Whitley first began working there. Approximately twenty-five percent of the inmates are women.

PLN, a project of the Human Rights Defense Center (HRDC), publishes a number of books and magazines which it sends to incarcerated persons along with materials published by others. The publications that are identified in the complaint as having been refused and sent back to PLN from NRADC are: (1) a monthly journal published by PLN titled *Prison Legal News: Dedicated to Protecting Human Rights*, which contains analysis and news on the topic of prisoners' rights; (2) a softcover book published by PLN titled *The Habeas Citebook: Ineffective Assistance of Counsel* (*Habeas Citebook*); and (3) a publication of the Southern Poverty Law Center, distributed

exclusively by PLN, titled *Protecting Your Health and Safety* (*PYHS*), which explains the basic rights of U.S. prisoners with regard to abuse and various other health and safety-related issues.

The complaint alleges that, from October 2014 through the filing of the complaint, all three of these publications were not delivered to PLN's intended recipients incarcerated at NRADC, in varying numbers and on various dates. Most were returned with a simple notation that they were refused per jail policy, although occasionally a publication was returned without any reason provided.

The facts show that these rejections were the result of a new NRADC policy, effective April 1, 2014, concerning outside publications. Prior to that time, an inmate was permitted to possess only five softcover books in his cell, although he also could have one religious book and two educational books, in addition to the five "regular" books. (Corbin Dep. 20–21, Dkt. No. 84-1; *see also* Whitley Dep. 48, Dkt. No. 84-2.) According to Corbin's testimony, he did not believe there was any numeric restriction on magazines prior to April 1, 2014. (Corbin Dep. 21–22.) All books and magazines were screened for contraband and for inappropriate pictures (such as pornography) or content that was otherwise considered a security risk.

With the enactment of the April 1, 2014 policy, the NRADC prohibited prisoners from receiving books or magazines through the mail, "directly from the publisher, or from a distribution source." (Second Am. Compl., Ex. 1, Dkt. No. 25-1.) Instead, the policy outlined that books and magazines would be provided by the programs section through the library cart and would be "appropriately marked as property of the NRADC." (*Id.*) Each inmate would be allowed to keep only one book at a time. Additionally, the carts would contain multiple copies of five specific magazines. The policy contained an exception, however, noting that "[r]eligious books approved by the chaplain and educational books approved by the Captain of Security or designee will still be

allowed" to be possessed by an individual prisoner.   (*Id.*; *see also id.* at Ex. 2, Dkt. No. 25-2 (discussing the policy for religious books).)

Two reasons were given for the new policy: to control contraband and to reduce the amount of inmate personal property.   Whitley has further explained that he believed the policy would cut down on the time it took to search cells, because the amount of personal property would be reduced.   He adopted the policy based on similar (or identical) policies that had been in place at other Virginia jails where he had worked.   He also noted that there were no complaints about the new April 2014 policy from any prisoners; the only complaint he got was from PLN's attorney. (Whitley Dep. 38.)

After the filing of this lawsuit and pursuant to the consent orders entered by the court, the policy was changed to allow three books to each inmate, in addition to religious books and books used for internal or external educational programs.   Each prisoner now is permitted to have five magazines in his cell, and NRADC also still subscribes to magazines on the book cart.   A prisoner may also have up to three days of newspapers in his cell, which did not change from the prior policy.   (Corbin Dep. 27–29.)   Additionally, the first consent decree requires that the sender and any specific recipient be notified if mail is rejected, with a specific reason for the rejection, and that the sender or inmate be given the opportunity to file a written appeal, to which a jail official will respond in writing "within a reasonable time period."   (First Consent Order, Dkt. Nos. 46-1, 47.)

Corbin testified that the changeover to the new policy outlined in the consent order has been "pretty smooth."   (Corbin Dep. 29.)   He noted that it "takes more work" than under the April 2014 policy, but he believes that, overall, the work is warranted because the new policy serves both NRADC and the inmates.   (*Id.*)   Whitley testified that the new policy involves "more

work" for his staff in terms of reviewing publications and other reading materials and generating more reports about what is being rejected and for what reason. (Whitley Dep. at 40–41, 43.)

The operative complaint—PLN's Second Amended Complaint—asserts four separate counts arising out of the rejections of the various publications, and all are brought under 42 U.S.C. § 1983. Count I alleges a violation of PLN's First Amendment rights based on defendants' interference with its attempts to correspond with NRADC prisoners, and also purports to assert a First Amendment claim on behalf of prisoners confined at NRADC. (Second Am. Compl. ¶¶ 40–46.) Count II alleges that defendants violated PLN's Fourteenth Amendment right to due process because they failed to give adequate "notice of and an opportunity to appeal Defendants' decisions to censor PLN's written speech." (Id. ¶¶ 47–54.) In Count III, PLN brings another First Amendment claim, alleging that defendants' prior policy constitutes content-based discrimination, since it prohibited "secular" books, but allowed "religious books." (Id. ¶¶ 55–57.) Count IV asserts a violation of the Fourteenth Amendment's Equal Protection Clause because the old policy prohibited "secular" books but allowed "religious" books. (Id. ¶¶ 58–59.)

In its prayer for relief, PLN requests a declaration that defendants' policies and practices violated the First and Fourteenth Amendments, nominal damages for each violation of rights by defendants, an injunction preventing defendants from continuing to violate the rights of PLN "and other senders of publications," compensatory and punitive damages, and costs and attorneys' fees. (Id. at 12.)

As noted, the parties were able to reach an agreement that effectively modified the April 1, 2014 policy, and they submitted consent orders to the court containing those modifications. The first consent order addressed PLN's due process concerns and was designed to ensure that defendants would provide notice and an opportunity to appeal any future rejection of a publisher's

communications with prisoners.   (First Consent Order.)   As the parties have acknowledged and the court has recognized, the first consent order "resolved Plaintiff's claim for equitable relief on the issue of due process of law for senders of censored mail."   (Second Consent Decree 6, Dkt. No. 50.)   On March 7, 2016, the parties' second proposed consent order was entered by the court; it implemented a new policy that allowed prisoners to receive publications (including PLN's publications) through the mail, subject to individual review.   This effectively addressed the injunctive relief sought by PLN's First Amendment claims and also addressed "all remaining issues" related to the motion for preliminary injunction.   (Joint Mot. Requesting Entry, ¶ 2, Dkt. No. 49; *see also* Second Consent Decree.)

After discovery, the parties filed their respective motions for summary judgment, which address how they contend the remaining issues in the case should be resolved.

## II.   DISCUSSION

### A.    Summary Judgment Standard

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the non-moving party.   *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).   In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

When considering cross-motions for summary judgment, the court must "consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law."   *Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014)

(quoting *Bacon v. City of Richmond, Va.*, 475 F.3d 633, 638 (4th Cir. 2007)).   "The party who bears the burden of proof on an issue at trial, however, cannot survive summary judgment without forecasting evidence sufficient to sustain his or her burden of proof on that point."   *McIntyre v. Aetna Life Ins. Co.,* 581 F. Supp. 2d 749, 756 (W.D. Va. 2008).

**B.    Defendants' Motion for Summary Judgment**

In their motion for summary judgment, defendants argue first that NRADC's mail policies challenged by PLN did not violate the First Amendment.   Although defendants repeatedly state in general terms that the policies were "constitutional," they offer no arguments as to how their rejection of PLN's publications satisfied due process or as to why they did not violate the Equal Protection Clause.[2]   Instead, they present arguments only with regard to the First Amendment claim, contending that the mail policies served legitimate penological interests and were constitutional pursuant to *Turner v. Safley*, 482 U.S. 78 (1987).   Even if the policies violated the First Amendment, however, Whitley contends that he is entitled to qualified immunity. Additionally, defendants assert that PLN may not recover any monetary damages because of both qualified immunity and "Superintendent Whitley's Eleventh Amendment immunity."   (Defs.' Mem. Supp. Mot. Summ. J. 1, Dkt. No. 81.)

In response to PLN's motion for summary judgment, defendants also argue that any claims for declaratory relief are mooted by the entry of the court's consent decrees.   For all of these reasons, defendants contend that monetary, injunctive, and declaratory relief are foreclosed.   (*Id.* at 1, 10.)   The court addresses each of these issues below.

---

[2]   Because defendants did not include any briefing in their motion for summary judgment as to the due process or equal protection claims, the court does not address those claims in the context of defendants' motion, nor can it grant judgment in their favor as to either claim at this time.   PLN moved for summary judgment as to those claims, though, and so the court will address those claims in discussing PLN's summary judgment motion.

### 1.  Merits of First Amendment claim in Count I[3]

Defendants contend they are entitled to summary judgment as to PLN's First Amendment claim because NRDAC's April 1, 2014 policy was not unconstitutional.   This issue will turn on the court's application of the four-factor test in *Turner*, 482 U.S. 78.   That is, to evaluate the constitutionality of a prison policy that impacts the First Amendment rights of prisoners (or publishers communicating with them), the court must look to the following factors:

> (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates" . . . ; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns."

*Lovelace v. Lee,* 472 F.3d 174, 200 (4th Cir. 2006) (quoting *Turner,* 482 U.S. at 89–92); *see also Thornburgh v. Abbott*, 490 U.S. 401, 404 (1989) (holding that prison regulations affecting a publisher's ability to send material to prisoners are valid if they are reasonably related to legitimate penological interests, and directing courts to apply the *Turner* factors in this context).   The Supreme Court has since clarified that the first factor *must* be satisfied for the regulation to be upheld.   *Shaw v. Murphy*, 532 U.S. 223, 229–30 (2001) (explaining the first *Turner* factor and noting that "[i]f the connection between the regulation and the asserted goal is 'arbitrary or irrational,' then the regulation fails, irrespective of whether the other factors tilt in its favor"); *see*

---

[3]  The parties' briefing is inconsistent and unclear as to whether the First Amendment claim in Count III—which alleges content-based discrimination—is effectively subsumed into the Equal Protection claim.   Most notably, in PLN's memorandum in support of its own summary judgment motion, PLN references the treatment of secular books versus religious books only in the context of its discussion of its Equal Protection claim.   The court therefore treats Count III as being conjoined with the Equal Protection claim.   As discussed in this section, though, the fact that the policy treated the types of publications differently may be relevant under the *Turner* analysis as to Count I.

*also Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006) (describing the first factor as an "'element' because it is not simply a consideration to be weighed but rather an essential requirement").

When applying the *Turner* factors, the court must "respect the determinations of prison officials," *United States v. Stotts,* 925 F.2d 83, 87 (4th Cir. 1991), and "must accord deference to the officials who run a prison, overseeing and coordinating its many aspects, including security, discipline, and general administration." *Lovelace,* 472 F.3d at 199. That is, the court must accord "substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

There are several cases rejecting First Amendment challenges to similar prison regulations that restrict either prisoners' access to publications or a publisher's ability to reach inmates. In *Couch v. Jabe*, No. 7:11-cv-34, 2012 WL 3043105 (W.D. Va. July 25, 2012), for example, the court held that a Virginia Department of Corrections (VDOC) policy requiring that a prisoner complete a personal property request form prior to receiving publications was not an impermissible burden on the plaintiff's First Amendment rights. There, a prison official explained that abolition of the request form requirement would have a significant impact on VDOC operations (causing increased staff time to handle, screen, and dispose incoming mail), and the plaintiff failed to establish that he would be denied possession of these books if he filled out the simple, short form. *Id.* at *6. *Accord Prison Legal News v. Jones*, No. 4:12-cv-239, 2015 WL 12911752, at *16 (N.D. Fl. Oct. 5, 2015), *appeal docketed*, No. 15-14220 (11th Cir. argued June 10, 2016) (concluding—after a four-day bench trial—that defendant had offered legitimate

reasons for a prison regulation that required a publication to be impounded if it had "prominent or prevalent" advertisements for services prohibited under the regulation, including advertisements for pen pals, three-way calling services, and conducting a business or profession while incarcerated and thus upholding it under the *Turner* test).

Likewise, in *Prison Legal News v. Stolle*, No. 2:13-cv-424, 2014 WL 6982470 (E.D. Va. Dec. 8, 2014), the court upheld a regulation concerning incoming publications, granting the defendant sheriff's motion for summary judgment and denying the plaintiff's motion. In *Stolle*, the jail had repeatedly rejected copies of PLN because it contained ordering forms, and that was against prison policy, which banned mail containing "ordering forms with prices." *Id.* at *5. The defendants asserted that the "order form ban [was] designed to protect the public from fraud, further stating that there have in the past been investigations into [the correctional center] inmates fraudulently using credit cards to purchase goods from outside vendors, as well as problems with inmates using stamps as currency to purchase items from outside vendors." *Id.* The *Stolle* court considered the *Turner* factors and concluded the grounds given were adequate to uphold the regulation. *Id.* Its reasoning emphasized both that the burden of proof is on the plaintiff and the great deference due to prison officials.

In contrast to the foregoing cases, a number of courts have found similar prison regulations unconstitutional, particularly where they preclude an entire class of publications. For example, in *Prison Legal News v. Lehman*, 397 F.3d 692, 699–700 (9th Cir. 2005), the court struck down as unconstitutional a prison regulation banning non-subscription bulk mail and catalogs. The *Lehman* court noted that, in previous cases, it had held that a ban on non-profit bulk mail was unconstitutional and that a ban on subscription for-profit bulk mail was unconstitutional. *Id.* at 698–99 (citing *Prison Legal News v. Cook*, 238 F.3d 1145, 1152–53 (9th Cir. 2001), and *Morrison*

*v. Hall*, 261 F.3d 896 (9th Cir. 2001)).   The same rationale applied to the non-subscription bulk mail and catalogs.   *Id.*

Likewise, in another case in which PLN was a plaintiff, *Jacklovich v. Simmons*, 392 F.3d 420, 421 (10th Cir. 2004), the Tenth Circuit reversed the district court's partial grant of the defendants' motion for summary judgment.   The reversal was due to the district court's error in failing to consider the second, third, and fourth *Turner* factors, and also because the appellate court was persuaded that there were disputed issues of material fact as to all four factors.   *Id.* at 427. There, state prison inmates and PLN challenged a Kansas prison regulation that: (1) allowed purchases only by inmates through their account and prohibited the receipt of all gift publications; and (2) limited outgoing funds to $30 per month per inmate and, as to certain levels of inmates, prohibited the use of outgoing funds to purchase books, newspapers, or magazines, although some of those same inmates were permitted a hot pot, fan, alarm clock, blow dryer, extension cord, lamp, ice chest, curling irons, and other items.   *Id.* at 423–24.   The officials argued that the ban on gift publications allowed the facility to monitor and regulate all inmate financial transactions, control property, and better detect problematic financial transactions, as well as prevent inmates from coercing others to arrange for gift subscriptions to be purchased by someone on the outside. *Id.* at 425.   They also claimed that the policies distinguishing between levels of inmates provided incentives for good behavior and better citizenship.   *Id.*   The appellate court, however, concluded that the constitutionality of the regulations was a jury question under *Turner*.

Where a regulation is, or is akin to, a "blanket" prohibition, moreover, courts seem more likely to rule it unconstitutional.   *See, e.g., Mann v. Smith*, 796 F.2d 79, 81–82 (5th Cir. 1986) (deeming unconstitutional a jail's rule that its inmates could not receive newspapers and magazines, because it allowed other materials that posed similar security problems); *Kincaid v.*

*Rusk*, 670 F.2d 737, 744 (7th Cir. 1982), *abrogated on other grounds by Archie v. City of Racine*, 847 F.2d 1211, 1220–23 (7th Cir. 1988) (en banc) (striking down as unconstitutional, in a pre-*Turner* case, a jail policy that allowed pretrial detainees only soft-bound, non-pornographic books and non-pictorial magazines (such as Reader's Digest and the Bible) because "[m]aintenance of security and discipline do not justify the wholesale prohibition of pictorial magazines, hardbound books or newspapers," and there were less restrictive means of accomplishing the same objectives).

As is evident from the discussion of the foregoing cases, analyzing First Amendment claims challenging prison regulations is a highly fact-specific exercise. So, while these cases are instructive in showing how other courts have applied the *Turner* factors to similar prison policies, they do not answer the question of whether the specific policy here, given the rationale offered for it, was constitutional. As explained below, moreover, the court believes that a reasonable factfinder could resolve the *Turner* test in favor of PLN or NRJA. Thus, the court cannot grant summary judgment on this claim in favor of either party, and will instead allow the claim to proceed to trial.

As to the first *Turner* factor, which requires a rational connection between the regulation and the interest asserted and which must be satisfied, the court concludes that no reasonable jury could find it is not satisfied. The reasons advanced for implementing the policy were to control contraband and to reduce the amount of inmate personal property. Certainly, the April 2014 policy was rationally connected to the goal of reducing inmate personal property. It significantly limited the number of books an inmate could have (to only pre-approved religious or educational books), and restricted prisoners altogether from owning or possessing magazines or taking them into their cells. This alone satisfies the first requirement. Likewise, with regard to the control of

contraband, Whitley explained that he received reports that people were tampering with periodicals sent to the jail.[4] Allowing only a limited number of the same type of magazine, addressed to the jail rather than to any individual prisoner, is rationally connected to the security goal of preventing periodicals from being tampered with to introduce contraband. The court thus concludes that the policy here satisfies the first *Turner* factor.

In so ruling, it is worth noting that "a jail 'does not need actually to demonstrate that its regulations' succeed in achieving the penological goals at which they are aimed; the regulations must instead merely have a rational relationship to the stated goals." *Stolle*, No. 2:13-cv-424, 2014 WL 6982470, at *7 (citing *United States v. Stotts*, 925 F.2d 83, 86 (4th Cir. 1991)). This point has been emphasized in other cases denying similar claims under *Turner*, as well. *See, e.g.*, *Gardner v. Mould*, No. 7:13-cv-00429, 2014 WL 3513150, at *4 (W.D. Va. July 14, 2014) ("The inquiry for the court is not whether the regulation actually advances the stated government interest, but only whether the policymaker 'might reasonably have thought that it would.") (citation omitted).

PLN also contends that the fact that religious materials and educational materials were exempted undermines the rationales given. Several courts have recognized that allowing certain types of similar material while excluding others may undermine the given rationale. *See, e.g.*, *Murchison v. Rogers,* 779 F.3d 882, 890 (8th Cir. 2015) ("The existence of *similar* material within the prison walls may serve to show inconsistencies in the manner in which material is censored

---

[4] Although PLN emphasizes that the reports were "unverified," it offers no authority for the proposition that jail officials must have concrete evidence that a particular problem has occurred. Other courts have rejected such a requirement. *See, e.g.*, *Prison Legal News v. Jones*, No. 4:12-cv-239, 2015 WL 12911752, at *16 (N.D. Fl. Oct. 5, 2015), appeal docketed, No. 15-14220 (11th Cir. argued June 10, 2016) (collecting authority and noting that there is no requirement that an actual, past incident have occurred before prison administrators can implement a regulation addressing a problem; instead, they may act based on a reasonable assessment of potential dangers). Furthermore, as already noted, the court must give substantial deference to prison officials' evaluation of security risks. *Lovelace*, 472 F.3d at 199.

such as to undermine the rationale for censorship or show it was actually censored for its content.") (emphasis added); *see also Jacklovich,* 392 F.3d at 429–30 (reasoning that, where jail allowed free publications and religious publications by subscription and a primary religious text, but disallowed other publications, that inconsistency was perhaps content-based and undermined the given rationale for the ban on other publications).   Here, though, for the reasons already discussed, the court concludes that there was a sufficient connection between the policy and the rationale to find that the policy related to a legitimate penological objective, especially given the deference due to prison officials about decisions in this area.

The second factor, which is whether there is an alternative means for PLN to exercise its rights, clearly favors PLN.   Although the policy admittedly left alternative means open to *inmates* to exercise their First Amendment rights, and allowed them some access to magazines— albeit those selected by NRADC—it did not leave any such means open to PLN.   Indeed, the policy was effectively a complete ban on any prisoner being able to obtain PLN publications, whether through a subscription or a gift subscription.   This stands in contrast to other cases where less drastic restrictions were upheld.

The *Thornburgh* court, for example, noted that the regulation before it "permit[ted] a broad range of publications to be sent, received, and read."   490 U.S. at 418.   Here, the only "alternative" offered to inmates is access to books from a library cart and only copies of five different magazines chosen by NRADC.   Further, PLN is not one of the five "magazines" permitted.   Thus, it appears that PLN is being denied total access to the prisoners at the jail and does not have an adequate alternative method for reaching prisoners.   Certainly, the policy here was much more restrictive, *i.e.*, more of a blanket ban than the policy in *Thornburgh*, and more like

(at least from the perspective of the publisher) the policies struck down and questioned in *Lehman* and *Jacklovich*, respectively.

As to both the third and fourth *Turner* factors, there are facts which tend to support PLN, and others which tend to support defendants. In short, because a reasonable jury could rule in favor of either party on these two factors, the court cannot grant summary judgment for either party.

As to the third factor, which is the impact on security, staff, inmates, and the allocation of resources—this factor does not clearly favor either side. On the one hand, there is some evidence that there has been a negative impact on the allocation of resources and staff by PLN's proposed accommodation, which is set forth in the consent decree. Both Corbin and Whitley testified that the consent decree policy required more work up front to review incoming publications, as opposed to a complete ban on personal magazines, which would require no screening. Logically, moreover, the less personal property that is possessed by prisoners, the less resources will be spent inspecting that property and conducting cell checks for contraband. It is easy to see a connection between less personal property and lesser security risks. So, the prior outright ban was probably less staff-intensive.

On the other hand, though, NRJA spent a good amount of money to purchase books and magazines to make them available to all inmates under the challenged policy. So, there was a cost associated with that, too. Furthermore, both Corbin and Whitley freely admitted that there were benefits to the new policy and it was certainly workable. Corbin, in particular, noted that the roll-out of the revised policy had been "smooth," and although it requires more resources, neither Whitley nor Corbin expressed that it was a huge amount.

On balance, the court believes that the facts here could give rise to an inference of reasonableness or unreasonableness of the policy as to this factor, regardless of whether the evidence is considered in the light most favorable to defendants (for purposes of PLN's motion), or in the light most favorable to PLN (for purposes of defendants' motion).

The same is true of the fourth factor. Under the fourth factor, the plaintiff bears the burden of suggesting an easy alternative that "fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests." *Turner*, 482 U.S. at 91. PLN contends that the policy put in place as a result of the consent decree is precisely such an alternative. The obvious alternative to the concern regarding contraband being hidden in books is to limit the number of books available to a prisoner in his cell, including religious texts. Such a limitation (as opposed to prohibiting all books or publications except religious texts) is a ready alternative that suggests the April 2014 policy was an "exaggerated response" to the problem. *See id.* The alternative was a fairly "obvious, easy alternative" to the challenged regulation—one that also accomplishes the same basic goals of reducing personal property and negating contraband, but without such a significant impact on PLN's First Amendment rights. On the other hand, though, the court cannot say, based on the record, that the alternative policy has only imposed a *de minimis* cost on defendants.

For the reasons already discussed, then, the court cannot conclude—as a matter of law—that application of the *Turner* test results in only one reasonable conclusion. Instead, the court concludes that a factfinder must determine the appropriate balance of the competing evidence. Thus, the court will deny both parties' motions for summary judgment on the First Amendment claim in Count I and will allow a jury to determine whether the April 2014 policy violated PLN's First Amendment rights.

### 2. **Qualified immunity**

Having determined that whether PLN has shown a violation of its First Amendment rights is for a jury, the court turns to defendants' next contention, which is that the claims seeking compensatory damages against Whitley are barred by qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *accord Anderson v. Creighton*, 483 U.S. 635, 638 (1987). The qualified immunity analysis involves two questions: first, whether the defendant's actions as alleged violate a constitutional right; and second, whether the right at issue was clearly established at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232. Under *Pearson*, the court need not address the first prong of the qualified immunity analysis in all circumstances, but may exercise its discretion and look to the second prong. 555 U.S. at 236–37. The court has already concluded that there are disputes of fact as to whether the defendants' actions violated the First Amendment. Thus, as to that claim, the court will exercise its discretion to address only the second prong of the analysis, *i.e.,* whether the facts alleged show a violation of PLN's clearly established constitutional rights.

In determining whether a right is clearly established, courts must consider the right at issue with particularity. *Anderson*, 483 U.S. at 640; *Edwards v. City of Goldsboro*, 178 F.3d 231, 250–51 (4th Cir. 1999). "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (alterations in original) (internal quotations omitted); *see also Anderson*, 483 U.S. at 640. "In other words, 'existing precedent must have placed the

statutory or constitutional question beyond debate.'" *Reichle*, 132 S. Ct. at 2093 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640 (citations omitted).

The heart of defendants' argument is that Whitley "believed that the policy was constitutionally sound because other adult detention centers had similar policies." (Defs.' Mem. Supp. Mot. Summ. J. 8.) But the fact that Whitley may have sincerely believed the policy was constitutional is irrelevant to the qualified immunity inquiry. Instead, the question is whether the right was clearly established. *Pearson*, 555 U.S. at 232.

With regard to the First Amendment claim, the court concludes that Whitley is entitled to qualified immunity. Specifically, the law was not clearly established in April 2014 that the policy here would violate the First Amendment. Although it was clear that *Turner* applied to PLN's claims, it was less clear how *Turner* would apply in this particular instance. As noted above, *Turner* requires a balancing test, and applying that balancing test here, the answer was not "beyond debate" that this policy would violate the First Amendment. *Reichle*, 132 S. Ct. at 2093. "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). Here, Whitley may have made a bad guess in a gray area, but that is insufficient to hold him liable. Accordingly, the court concludes that qualified immunity bars any claims for damages against Whitley for the First Amendment claim.

As to the due process violation, the court discusses that claim in more detail in the context of PLN's motion for summary judgment. *See infra* at Section II.C.2. As detailed there, the court

concludes that—as a matter of law—the April 2014 policy violated PLN's due process rights. The court further concludes that PLN's right to due process was clearly established. When the policy was implemented in April 2014, both the Supreme Court and the Fourth Circuit had squarely held that a prison or jail that rejected a publication sent from a person outside was required to give procedural protections in the event the publication was rejected, which would require at least notice of the rejection and some opportunity to be heard or to challenge the decision. Thus, the court concludes that the right was a clearly established one and that Whitley is not entitled to qualified immunity as to the due process claim.

For the above reasons, the court concludes that Whitley is entitled to qualified immunity as to the First Amendment claim, but not the due process claim.[5]

### 3. Eleventh Amendment immunity

Defendants next argue that PLN's claim for monetary damages is barred by the immunity conferred by the Eleventh Amendment. (Defs.' Mem. Supp. Mot. Summ. J. 9.) Defendants are correct that the Eleventh Amendment confers immunity on states and entities that are deemed arms of the state, which applies if the entity's relationship with the state "is close enough to implicate the 'dignity of the State as a sovereign.'" *Kitchen v. Upshaw*, 286 F.3d 179, 184 (4th Cir. 2002) (quoting *Cash v. Granville Cty. Bd. of Educ.*, 242 F.3d 219, 224 (4th Cir. 2001)). But in *Kitchen*, the Fourth Circuit rejected the argument raised by defendants here, explicitly ruling that a regional jail authority "is not an arm of the State for purposes of Eleventh Amendment immunity." *Id.* Accordingly, defendants are not entitled to Eleventh Amendment immunity.

---

[5] As to the equal protection claim, the court denies PLN's motion for summary judgment because it has failed to show a violation. *See infra* Section II.C.3.

### 4. **PLN's damages**

#### a. *Compensatory damages*

Defendants also contend that PLN cannot prove it was damaged, and so it has suffered, at most, only nominal damages. (Defs.' Mem. Supp. Mot. Summ. J. 10.) They note that PLN's 30(b)(6) representative testified that as of April 1, 2014, PLN only had one paid inmate subscriber at NRADC and that "[t]he rest of PLN's publications were sent by PLN to inmates at the NRADC free of charge." (*Id.*)

PLN responds that it is entitled to compensatory damages for the violations of its rights, for the frustration of its non-profit mission, diversion of resources, loss of potential subscribers and customers, and loss of the ability to recruit new subscribers and supporters. (Pl.'s Opp'n to Defs.' Mot. Summ. J. 11, Dkt. No. 83.) PLN cites primarily to its amended complaint for support, which is insufficient to meet its burden on summary judgment. *See* Fed. R. Civ. P. 56(c), (e) (explaining the types of materials that can properly be used to support assertions of fact). Furthermore, the amended complaint contains only bare allegations of these damages.

PLN also refers to the declaration of Paul Wright, PLN's founder and editor, which PLN originally submitted in support of its request for preliminary injunction and which PLN reattached to its summary judgment motion. (Wright Decl., Dkt. No. 72-1.) Although Wright's declaration offers no specific information about any monetary damages suffered, it states that defendants censored PLN's monthly journal and books on at least 211 occasions.

The evidence as to damages is scant, to say the least. Nonetheless, the court has found that at least PLN's due process rights were violated, and PLN has alleged enough—even with just a single violation, based on its single subscriber—to allow its claim of damages to go to a jury. In short, there is some basis for a conclusion that PLN has been damaged and is entitled to

compensatory damages, although any award will have to be supported by adequate evidence at trial.

As noted, defendants also question whether a publisher may recover damages for rejection of gift subscriptions at a prison. The parties do not cite to any Fourth Circuit cases addressing this issue, but PLN cites to out-of-circuit law stating that damages may be had for gift subscriptions that were rejected. Given that there is evidence that PLN had a paid inmate subscriber at the time of the April 2014 policy, the court need not resolve at this time whether the gift subscriptions can give rise to claims for damages.

### b. Punitive damages

In a single line at the end of its opposition memorandum, PLN contends that it is entitled to punitive damages because defendants' conduct "contradicted clearly established law." (Pl.'s Opp'n to Defs.' Mot. Summ. J. 11.) The court finds no merit in PLN's contention that punitive damages might be awarded here. First of all, PLN is not citing the appropriate standard for punitive damages. To be entitled to a punitive damages award, PLN would have to show, by a preponderance of the evidence, that the defendants acted intentionally and with a callous or reckless disregard or indifference toward PLN's constitutional rights, or that their conduct was motivated by evil intent. *Morris v. Bland*, 666 F. App'x 233, 240 (4th Cir. 2016); *Butler v. Windsor*, 143 F. Supp. 3d 332, 337 (D. Md. 2015). There is no evidence in the record that would support such an award against any of the defendants. All the evidence shows that Whitley—the final policy-maker—believed the policy to be constitutional.[6] In short, there is insufficient evidence from which a jury could find that any defendant acted "with a callous or reckless

---

[6] Whitley candidly admitted that, when advised by PLN's attorney of the potential violation, he did not inquire further, except to show the attorney's letter to Corbin and respond to the attorney that he would look into it. But he also explained that he did not put much stock in letters from attorneys. He also repeatedly stated that since the same policy was used at two other Virginia facilities, to his knowledge, he did not think it presented constitutional problems.

disregard or indifference" toward PLN's constitutional rights, and so the court will dismiss PLN's request for punitive damages. *See Butler*, 143 F. Supp. 3d at 337.

Consistent with the foregoing analysis as to all of the issues raised by defendants, defendants' motion for summary judgment will be granted in part and denied in part.

## C.    PLN's Motion for Summary Judgment

In its own motion for summary judgment, PLN argues first that defendants' policies were not rationally related to any legitimate penological purpose and that defendants effectively acquiesced to liability by agreeing to the consent decree.   It requests a declaratory judgment stating that:

> 1.   Defendants' policy, practices, and customs prohibiting prisoners from receiving magazines, books, and newspapers directly from publishers or distributors violated the First Amendment rights of prisoners;
>
> 2.   Their policy, practices, and customs denying due process notice and providing no opportunity to appeal their censorship violated the Fourteenth Amendment; and
>
> 3.   Defendants' policy, practices, and customs allowing religious books but denying secular ones violated the equal protection clause of the Fourteenth Amendment.

It also seeks a declaration that, due to the agreed-upon consent decrees, PLN is entitled to: "(1) an award of nominal, punitive, compensatory, and presumed damages for each violation of [PLN's] First Amendment rights; (2) an award of nominal, punitive, and compensatory damages for each violation of [PLN's] Fourteenth Amendment rights; (3) costs, including reasonable attorney's fees under all applicable law; and (4) pre-judgment and post-judgment interest, if applicable."   (Pl.'s Mem. Supp. Mot. Summ. J. 10.)

In their response to this motion, defendants argue that the request for declaratory judgment is moot in light of the consent decrees. They also offer various arguments as to why PLN is not entitled to the other relief it seeks.

### 1. Effect of the consent decrees

As an initial matter, the court rejects PLN's assertion that defendants have conceded a constitutional violation by virtue of entering into the consent decrees. While all parties agree that the consent decrees mooted the motion for preliminary injunction, neither one of the orders definitively decided the constitutional questions in PLN's favor. Indeed, neither of the consent decrees contain any statement that defendants are admitting liability, and both include express language that "[a]ll other issues in this matter remain pending" (First Consent Decree 1), or that the court "retains jurisdiction of this matter . . . for the disposition of all other claims in Plaintiff's complaint which remain pending, specifically, those for Plaintiff's damages and attorney's fees." (Second Consent Decree ¶ 13.) Moreover, it is entirely possible for a party to implement a policy change that improves on an otherwise constitutional policy, just to appease a litigation opponent. It is also consistent with the decrees to conclude that defendants were agreeing to the injunctive relief, while maintaining that no violation had occurred. In short, in the absence of any express concession of liability or of a constitutional violation, the court declines to read one into the consent decrees. Thus, the court disagrees with PLN that the consent decrees themselves mean that defendants have admitted, or that PLN has established, a violation of PLN's constitutional rights.

Defendants suggest a different result from the consent decrees. Specifically, defendants' response to PLN's motion argues that, because of the entry of the consent decrees and the new policies they put in place, the request for declaratory judgment is moot. (Defs.' Opp'n to Pl.'s

Mot. Summ. J. 4–6, Dkt. No. 82.) They reason that under the circumstances here, a declaratory judgment would constitute retrospective relief and is therefore barred by the Eleventh Amendment. (*Id.* at 5 (citing, among other cases, *Int'l Coal for Religious Freedom v. Maryland*, 3 F. App'x 46, 49 (4th Cir. 2001)). As already discussed, though, defendants are not entitled to Eleventh Amendment immunity. Accordingly, the principles governing the cases cited by defendants are inapplicable here.

Defendants also point out that the decision to award declaratory relief is a discretionary one, and the Fourth Circuit has instructed that: "of paramount importance in the decision to exercise such discretionary authority is whether 'the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and . . . [whether] it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Int'l Coal. for Religious Freedom*, 3 F. App'x at 52 (discussing the discretionary basis of such relief as an alternative ground to the Eleventh Amendment ground). Indeed, 28 U.S.C. § 2201 *permits* this court to declare rights of a party but does not require declaratory judgment.

A case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Simmons v. United Mortg. & Loan Inv.*, *LLC*, 634 F.3d 754, 763 (4th Cir. 2011). A change in circumstances can moot a case, such as "when the claimant receives the relief . . . she sought to obtain through [her] claim." *Id.* (quoting *Friedman's, Inc. v. Dunlap*, 290 F.3d 191, 197 (4th Cir. 2002)). In this case, the court does not believe the case is moot, particularly since PLN sought damages and declaratory relief in addition to injunctive relief. Thus, it is clear the entire case is not mooted by the entry of the consent decrees. *Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc.*, 138 F.3d 351, 355–56 (8th Cir. 1998) ("When a claim for injunctive relief becomes moot, a related claim for money relief is not

mooted 'as long as the parties have a concrete interest, however small, in the outcome of the litigation.'") (quoting *Ellis v. Bhd. of Ry. Airline & S.S. Clerks*, 466 U.S. 435, 442 (1984)).

Nonetheless, despite the fact that the case is not moot, the court does not believe that declaratory relief here "will serve a useful purpose in clarifying and settling the legal relations in issue" or "afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Volvo Constr. Equipment N. Am., Inc. v. CLM Equipment Co., Inc.*, 386 F. 3d 581, 594 (4th Cir. 2004) (quoting *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937)). As acknowledged by both parties, whether or not to issue declaratory judgments is a matter within this court's discretion. Here, the court believes that the entry of the consent decrees granting PLN the injunctive relief it sought and the court's ruling allowing a jury trial on some issues—taken together—are sufficient to vindicate PLN's rights in this case, and so a declaratory judgment is not necessary to clarify or settle the legal questions in issue. *See id.* Accordingly, the court declines to exercise its discretion to issue declaratory relief in this case.

As to the merits of PLN's claims, the court's analysis on the First Amendment claim is set forth as part of its discussion of defendants' motion for summary judgment. The court turns briefly to the due process and equal protection claims, as to which PLN seeks summary judgment.

## 2. Due process violation

The law concerning due process rights in this area is fairly well-established. The Fourth Circuit has explained "that publishers are entitled to notice and an opportunity to be heard when their publications are disapproved for receipt by inmate subscribers." *Montcalm Publ'g Co. v. Beck*, 80 F.3d 105, 106 (4th Cir. 1996). *See also id.* at 109 (explaining that publishers are entitled to process upon a prison rejecting their mailings and that "providing a copy of [the notice of rejection] to publishers of disapproved publications and allowing the publishers to respond in

25

writing would pose a minimal burden on corrections officials," but noting that its holding might not apply to "mass mailings"). Other courts have applied the same rationale to cases of gift subscriptions sent by publishers. *See, e.g.*, *Prison Legal News v. Jones*, No. 4:12-cv-239, 2015 WL 12911752, at *25 (ruling that PLN's due process rights were violated when it was not notified at all of the impoundment of its mailings, including gift subscriptions). Here, although PLN occasionally received notice that its mail was being rejected, albeit without any explanation other than "per jail policy," it was never advised of any way to appeal the rejections. Furthermore, at least one of the rejected documents was to an actual subscriber, so it was not only gift subscriptions that were rejected. Thus, the court concludes that the actions of defendants, pursuant to the April 2014 policy, violated PLN's due process rights.

### 3. Equal protection violation[7]

PLN's First Amendment claim in Count III, which claims content-based discrimination as part of the April 2014 policy, and its equal protection claim are both premised on the fact that the April 2014 policy prohibited personal ownership of books and magazines, but made an exception for "religious" materials.[8] Defendants' response is two-fold. First, they argue that PLN lacks third-party standing to assert an equal protection challenge. Second, they argue that, regardless of standing, any Fourteenth Amendment equal protection claim fails because there is no evidence that defendants acted with a discriminatory purpose.

The only evidence before the court as to the reason for the religious book exception was that Whitley was said he believed the facility needed to "[a]llow[] people to explore their religion

---

[7]  As noted *supra* at note 3, the court analyzes the equal protection claim and First Amendment claim in Count III together. To the extent that the First Amendment claim does not require "purposeful discrimination" but would be governed only by an analysis under *Turner*, the court concludes this claim fails. *See infra* note 9.

[8]  With regard to its equal protection argument, PLN focuses entirely on the "religious" exception in the April 2014 policy, but ignores that certain non-religious educational books were also permitted. Nonetheless, given PLN's singular focus on the preferred treatment of religious books, the court discusses only that aspect of the policy.

of choice to some degree" (Whitley Dep. 52), and that he had seen many complaints from prisoners about not having access to religious books during his career. (*Id.* at 53.) He also offered undisputed testimony that all religions were treated the same under the policy.

In order to succeed on its equal protection claim, PLN "must first demonstrate that [it] has been treated differently from others with whom [it] is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).

The court concludes, based on the undisputed facts in the record, that PLN has failed to establish that the unequal treatment of its publications and religious publications was the result of intentional or purposeful discrimination. To state a violation of equal protection, the plaintiff must produce sufficient evidence that the decision maker "selected or reaffirmed a particular course of action at least in part '*because of*,' not merely '*in spite of*,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (emphasis added). In *Feeney*, the plaintiff challenged a law giving employment preferences to veterans because the law would benefit mostly men, and very few women. The court acknowledged that the decision to grant a preference to veterans was "intentional" and that the legislature must have known that most veterans were men; thus, the adverse consequences for women were not unintended. *Id.* at 278. But the court concluded that nothing suggested that the legislature was attempting to adversely affect women, only that it was attempting to help veterans. *Id.* at 279.

PLN cites to no binding authority to support its equal protection claim based on the religious exception in the policy,[9] and, in the absence of evidence from which a reasonable jury could find purposeful discrimination against non-religious publishers in the implementation of the policy, the court concludes that no reasonable jury could find purposeful discrimination. The policy treated non-religious publications differently, but all evidence is that Whitley was trying to accommodate religious rights. Thus, the policy was implemented "in spite of" its effect on non-religious texts, not "because of" it. *See Feeney*, 442 U.S. at 279.

The Supreme Court's reasoning in a case addressing the constitutionality of RLUIPA,[10] which seeks to protect the religious rights of incarcerated persons, bears on the issues here. *Cutter v. Wilkinson*, 544 U.S. 709, 714 (2005) (holding that RLUIPA did not violate the Establishment Clause). Although *Cutter* did not involve an equal protection challenge to the statute, the court's reasoning made clear that religious exceptions to certain rules or legislation were constitutionally permissible. Indeed, the court rejected the argument that RLUIPA "impermissibly advance[ed] religion by giving greater protection to religious rights than to other constitutionally protected rights," and noted that religious accommodations "need not 'come packaged with benefits to secular entities.'" *Id.* at 724 (citations omitted); *see also Real Alts., Inc.*

---

[9] PLN cites to the case of *North v. Clarke*, No. 3:11-cv-211, 2012 WL 405162 (E.D. Va. Feb. 7, 2012). The *North* court held that a similar prison policy that banned certain non-religious CDs, but permitted similar religious CDs if pre-approved, was a violation of the plaintiff prisoner's equal protection rights. That court, however, applied strict scrutiny to the claim, which the Fourth Circuit has directed does not apply, even to racial classifications, in the prison context. *Morrison*, 239 F.3d at 656. Instead, if PLN could establish intentional or purposeful discrimination, then the court would apply the *Turner* test to determine whether there is a rational reason for the difference in treatment. *Id.* In any event, even if it were to reach and apply the *Turner* test to the alleged equal protection violation, the court agrees with defendants that the goal of protecting all inmates' First Amendment right to freely exercise their religion, and attempting to prevent lawsuits over the same, is a legitimate penological and rational goal furthered by the challenged policy.

[10] Section 3 of RLUIPA, the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc-1(a)(1)–(2), prohibits state and local governments from imposing "'a substantial burden on the religious exercise of a person residing in or confined to an institution,' unless the government shows that the burden furthers 'a compelling governmental interest' and does so by 'the least restrictive means.'" *Cutter*, 544 U.S. at 715 (quoting § 2000cc-1(a)(1)–(2)).

*v. Sec'y Dep't of Health & Human Servs.*, 867 F.3d 338, 351 (3d Cir. 2017) (denying equal protection challenge of secular, non-religious anti-abortion group that sought the same accommodation that health care law specifically provided to religious groups and noting "the historic principle of respect for the autonomy of genuine religions").   Furthermore, as noted by defendants and the Third Circuit in *Real Alternatives, Inc.*, there are "thousands of religious accommodations that have been enacted at the federal, state, and local levels" and allowing an equal protection challenge to succeed on the grounds that a law or ordinance contains a religious exemption would call into question all of them.   867 F.3d at 351 & n.10.

For all of these reasons, the court will deny PLN's motion for summary judgment as to its Fourteenth Amendment equal protection claim.[11]   Because defendants' motion for summary judgment did not expressly ask for judgment in its favor on the equal protection claim, or brief the issue as part of its own motion, the court will not grant judgment in defendants' favor on this claim. By separate order, however, the court will give notice that it intends to grant summary judgment in defendants' favor as to the equal protection claim for the same reasons it denies PLN's motion, and will give PLN a reasonable opportunity to respond.   Fed. R. Civ. P. 56(f).

III.   CONCLUSION

For the reasons set forth herein, the parties' motions for summary judgment are both granted in part and denied in part.   As a result of the court's ruling, the only remaining issues to be resolved are whether PLN can prevail on its First Amendment claim against NRJA and the compensatory damages, if any, that PLN is entitled to as to its First Amendment claim in Count I and its due process claim in Count II.   The court will also address by separate order, after giving the notice required by Federal Rule of Civil Procedure 56(f), whether defendants are entitled to

---

[11] In light of its ruling, the court does not reach the issue of standing.

judgment in their favor on the equal protection claim. The parties shall contact chambers to schedule a jury trial on the remaining issues.

Entered: September 29, 2017.

*/s/ Elizabeth K. Dillon*

Elizabeth K. Dillon
United States District Judge