IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division


PRISON LEGAL NEWS, a project of the  :
HUMAN RIGHTS DEFENSE CENTER

  :

   Plaintiff

v.         : Case No. 5:15CV00061

NORTHWESTERN REGIONAL JAIL  :
AUTHORITY, ET AL.,

  :

   Defendants.

## DEFENDANTS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

### INTRODUCTION

The matter involves constitutional challenges brought by Prison Legal News ("PLN"), a publisher of various written periodicals and books concerning inmate and prisoner legal rights. PLN contends that it sent its materials to inmates at the Northwestern Regional Adult Detention Center ("NRADC"), but the materials were rejected and sent back to PLN. PLN's complaint named as defendants Northwestern Regional Jail Authority ("NRJA"), NRADC, jail superintendent James F. Whitley, and Captain Clay Corbin. Captain Corbin has since been dismissed per the agreement of the parties.

PLN brought suit challenging the constitutionality of NRADC's mail policy under the First and Fourteenth Amendments of the U.S. Constitution. Prison Legal News sought injunctive relief concerning changing the mail policy and PLN's due process rights, as well as monetary relief seeking nominal, compensatory, and punitive damages.

After suit was filed, the parties entered into settlement discussions concerning PLN's injunctive relief. The parties subsequently provided the court with two consent decrees, which the

1

court entered on February 11, 2016 and March 7, 2016, respectively. (ECF Nos. 47, 50).

Both parties filed cross-motions for summary judgment arguing the merits of the First and Fourteenth Amendment claims. The Court issued a memorandum opinion whereby the Court granted and denied each party's motion in part. On November 20, 2018, The Court issued an order granting summary judgment in the Defendants' favor on PLN's equal protection claim. (ECF No. 101). After the consent decrees and Court's rulings, the only remaining issues to be resolved at trial are: (1) whether PLN can prevail on its First Amendment claim against NRJA, and (2) what compensatory damages, if any, PLN is entitled to as to its First Amendment claim in Count I and its due process claim in Count II.

## FINDINGS OF FACT

**Concerning Jurisdiction**

1. NRADC is located in Winchester, Virginia. It serves the City of Winchester, and the counties of Clarke, Fauquier, and Frederick.

2. Defendant NRJA is a jail authority created by the City of Winchester, Virginia and the counties of Clarke, Frederick, and Fauquier pursuant to Va. Code §§ 531.-95.2 *et seq.* and is responsible for the operation of the NRADC.

3. The challenged NRADC policy only concerned mailings entering NRADC.

**Procedural History**

1. PLN filed a Second Amended Complaint for Declaratory, Injunctive Relief and Damages ("Second Amended Complaint") on November 4, 2015.

2. The Second Amended Complaint named NRADC, James Whitley, and Clay Corbin as defendants.

3. The Second Amended Complaint alleged that from October 2014 to November 2015, PLN publications were not delivered to NRADC inmates. PLN asserted that a newly instituted

NRADC policy violated PLN's First and Fourteenth Amendment Rights of the U.S. Constitution. Second Amended Complaint ¶¶ 24-30

4. The Second Amended Complaint asserted several counts against the Defendants:

Count I – a violation of PLN's First Amendment rights based on Defendants' interference with its attempts to correspond with NRADC prisoners (and also purported to assert a First Amendment claim on behalf of NRADC inmates)

Count II – a violation of PLN's Fourteenth Amendment right to due process for failing to give adequate notice of and an opportunity to appeal Defendants' decisions to censor PLN's written speech.

Count III – a violation of PLN's First Amendment rights, alleging Defendants' prior policy constituted content-based discrimination by prohibiting "secular books," but allowing "religious books."

Count IV – a violation of the Fourteenth Amendment Equal Protection Clause by prohibiting "secular" books, but allowing "religious" books.

(*See,* Second Amended Complaint at ¶¶ 40 – 59)

5. PLN also filed a motion for Preliminary Injunction seeking to enjoin defendants from "unconstitutionally censoring" PLN's mail and seeking an order for defendants to provide all senders of mail with adequate due process.

6. Defendants filed an answer denying the allegations of the Complaint and raising various affirmative defenses. *See,* Defendants' Answer.

7. The court entered two consent decrees resolving PLN's injunctive relief claims. The trial on the remaining issues and damages claims was continued several times. Plaintiff's Ex. 20.

8. After discovery, PLN filed its motion for summary judgment on February 6, 2017, arguing that the original mail policy violated the First Amendment, as it was not rationally related to legitimate penological interests, as well as the Fourteenth Amendment because it allowed religious books but not most other secular books.

9. Defendants also filed their respective motion for summary judgment on February 6, 2017. Defendants argued that the original mail policy did not violate the First Amendment,

3

contending that the original mail policy served legitimate penological interests. Defendants also argued that Superintendent Whitley was entitled to qualified immunity.

10. The court issued a memorandum opinion whereby it ruled on the issues raised in the parties' cross-motions for summary judgment. The Court found NRJA and Whitley liable as a matter of law on PLN's Due Process claim. The Court granted qualified immunity to defendant Whitley on the First Amendment claim, and also dismissed defendant Corbin from the lawsuit. The Court explained that the only issues remaining for trial were: (1) whether PLN can prevail on its First Amendment claim against NRJA; and (2) compensatory damages, if any, that PLN is entitled to. *See,* Mem. Op., Dk. No. 89.

11. The Court discussed PLN's Fourteenth Amendment Equal Protection, but as the Defendants did not ask for judgment in its favor on that claim, the Court could not enter judgment in Defendants' favor on that claim. The Court noted its intention to grant summary judgment in favor of Defendants by separate order and afforded PLN opportunity to respond. *See,* Mem. Op., Dk. No. 89.

12. On November 20, 2018, the Court issued a separate order granting summary judgment in favor of the remaining Defendants on the equal protection claim. *See,* Mem. Op., Dk. No. 101.

## Background

1. PLN is a project of the Human Rights Defense Center and publishes a number of books and magazines which it distributes to prisoners across the country. Mem. Op., Dk. No. 89 at 2.

2. NRADC is a Virginia-credited detention center owned and operated by the NRJA. *Id.*

3. As of late November 2016, NRADC had approximately 650 inmates. In fiscal year 2014, NRADC averaged 580 inmates. In fiscal year 2015, NRADC averaged 638 inmates. *Id.*

4. James Whitley has been the superintendent at NRADC for approximately four years and was the superintendent during the relevant time period of this case. (Tr. at 75:9-12).

5. The NRJA had no input into any decisions that Superintendent Whitley made with respect to NRADC's mail policy. (Tr. at 75:16-25).

6. Prior to February 26, 2014, the NRADC had a policy which allowed inmates to receive books, magazines and other periodicals through the mail. Superintendent Whitley reexamined NRADC's policy after receiving numerous reports that people were tampering with mailings sent to the jail in order to hide contraband. (Tr. at Pg. 106:1 – 107:12) (Defense Ex. 1).

7. In addition to inmates using books, magazines, and periodicals to smuggle contraband, Superintendent Whitley was concerned about the number of books, magazines, and periodicals that inmates were accumulating in their cells. NRADC expended a great amount of resources reviewing these items and cell searches took much longer because of the amount of material inmates accumulated. (Tr. at 81:6- 82:18; 91:9-92:11; 109:9 – 19; 122:14 – 123:17; 130:15 – 131:4)

8. Superintendent Whitley reviewed adult detention centers throughout Northern Virginia, particularly Fairfax and Prince William counties, and decided to adopt an identical policy with respect to books and magazines at NRADC. (Plaintiff's Ex. 15); (Tr. at 26:2-8); (Mem. Op., Dk. No. 89 at 4).

9. Prior to the new policy, inmates could possess one religious book, two educational books, and up to five additional soft-covered books. All incoming books were required to be screened for contraband for inappropriate pictures (such as pornography) or content that was otherwise considered a security risk. (Mem. Op., Dk. No. 89 at 3).

10. The new policy provided that books and magazines would now be provided by the programs section through the library cart and marked as property of NRADC. Each inmate would be allowed one book at a time, but did provide for religious books approved by the chaplain and educational books approved by jail officials. (Plaintiff's Ex. 15).

11. NRADC implemented its new mail policy effective on April 1, 2014, which concerned outside publications. The policy prohibited prisoners from receiving books or magazine through the mail "directly from the publisher, or from a distribution source." (Plaintiff's Ex. 15).

12. NRADC also invested time and money expanding its library, creating book carts for each housing unit. NRADC ordered magazines directly from publishers and rotated them in and out each month. NRADC purchased over one thousand new books following the implementation of the new policy. NRADC provided approved books and magazines by its programs section through the library cart, affording inmates alternative means to obtain books, magazines, and other periodicals. (Tr. at 131:5 – 133:7).

13. Staff took inmate suggestions for magazines and books for the library cart. Inmates could request NRADC obtain a subscription to PLN's publication, or request individual magazines or books be included on the library cart, including PLN publications. No inmate ever requested PLN publications be included on the library cart. (Tr. at 99:25 – 101:15; 111:19-22).

14. PLN could communicate via letter correspondence with individual inmates at NRADC. PLN could also communicate with NRADC to obtain an institutional subscription. (Tr. at 61:12 – 25; 67:17-19; 100:19-101:15).

15. PLN alleges that from October 2014 through September 2015, its publications were not deliverable to PLN's intended recipients at NRADC. Most publications were returned as simply not deliverable pursuant to jail policy, but some were returned without providing a reason. (*See,* Plaintiff's Ex. 1 – 14).

16. PLN has a practice of mailing free copies of its publications to inmates it believes may be interested in its materials. PLN also obtains inmate mailing lists from other organizations.

17. In December 2013 and January 2014 – prior to the February 2014 notice that the mail policy would be changed – PLN had no paid subscribers incarcerated at NRADC.

18. In April 2014, after the NRADC's new policy went into effect, PLN only had one paid subscriber at NRADC, Mary Jenkins. (Tr. at 70:2 – 6)

19. Mary Jenkins paid for a subscription for monthly journals in April 2014. The cost of an annual subscription is $30.00.

20. Mary Jenkins, or her significant other, may have alerted PLN to the policy change at NRADC. At trial, Mr. Wright could not testify as to who specifically alerted PLN of NRADC's mail policy. (*See*, Tr. at 14:16-20).

21. PLN's legal counsel drafted a letter to Superintendent Whitley dated April 1, 2014, stating that he had recently been provided a copy of the February 26, 2014 memorandum, and requesting the policy be reversed. The letter never indicated that counsel represented PLN specifically. (Plaintiff's Ex.16); (Tr. at 26:21 – 27:5).

22. On April 3, 2014, Superintendent Whitley wrote an email to PLN's legal counsel indicating

he was in receipt of his April 1, 2014 letter, and would inform them of any changes they may make. (Plaintiff's Ex. 17); (Tr. at 27:21 – 28:6).

23. By October 2014, no subscriptions were paid for by inmates at NRADC. (Tr. at 69:10 – 22).

24. None of the books identified by PLN as "censored" were purchased by inmates at NRADC. (Tr. at 56:25 – 58:3).

25. Beyond any issues sent to Mary Jenkins during her subscription period, all remaining items mailed to NRADC and rejected pursuant to the old mail policy were unpaid sample or gift publications.

26. Paul Wright testified as to the retail price of the *Habeaus Citebook* and *Protecting Your Health & Safety* publications, but no evidence was introduced that any NRADC inmate purchased one of these publications. (Tr. at 54: 18-25).

27. Prior to initiating the present litigation, no employee of PLN, including the president of PLN, Paul Wright, ever communicated with Superintendent Whitley, Captain Corbin, or the NRJA about the mail policy. (Tr. at 63:4 – 22).

28. During the course of this litigation, PLN's Motion for Preliminary Injunction was held on January 15, 2016. The Court ordered that the parties shall attempt to reach a settlement related to Plaintiff's due process claim, and Defendants shall provide Plaintiff with a proposed modified policy. (Minute Order Entry, Dk. No. 43 at 1).

29. The parties were able to agree to a new NRADC mailing policy and provided the Court with two consent decrees. The Court entered both consent decrees. (Mem. Op., Dk. No. 89 at 1).

30. The policy was changed to allow three books to each inmate, in addition to religious books and educational books. Each prisoner is now also permitted to have five magazines in his cell. It also required that the sender and any specific recipient be notified if mail is rejected, the specific reason for the rejections, and an opportunity to file an appeal. *See,* Northwestern Regional Jail Standard Operating Procedure # 5.12. (Tr. at 124: 5-11).

31. As a result of the consent decrees, NRADC accepted that it must revert to diverting

valuable resources for examining periodical mailings for contraband and reducing excess inmate clutter. (Tr. at 110:6-8; 133:14 – 134:4).

CONCLUSIONS OF LAW

**Jurisdiction**

1. All of PLN's actions are brought pursuant to 42 U.S.C. § 1983 asserting violations of PLN's First and Fourteenth Amendment rights.

**First Amendment Violation**

1. The standard of review adopted in *Turner v. Safley,* 482 U.S. 78, 89-90 (1987) applies to all circumstances in which the needs of prison administration implicate constitutional rights.

2. When applying the *Turner* factors, the court "must accord great deference to the officials who run a prison, overseeing, and coordinating its many aspects, including security, discipline, and general administration." *Lovelace v. Lee,* 472 F.3d 174, 199 (4th Cir. 2006).

3. The court must therefore accord "substantial deference to the professional judgment of prison administrators who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta,* 539 U.S. 126, 132 (2003).

4. Under the *Turner* standard of review, the party challenging a prison regulation "bears the burden of showing that the [challenged] regulations . . . are not reasonably related to legitimate penological objectives, or that they are an 'exaggerated response' to such concerns." *Prison Legal News v. Livingston,* 683 F.3d 210, 215 (5th Cir. 2012).

5. The Court must consider the following factors pursuant to *Turner*:

   (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational";
   (2) whether "alternative means of exercising the right . . . remain open to prison inmates" . . .;
   (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and

> (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is not "reasonable, but is [instead] an exaggerated response to prison concerns."

*Lovelace,* 472 F.3d at 200 (4th Cir. 2006) (quoting *Turner,* 482 U.S. at 89-92)

6. The Supreme Court has clarified that the first factor *must* be satisfied for the regulation to be upheld. *Shaw v. Murphey,* 532 U.S. 223, 229-30 (2001).

7. This Court found that no reasonable juror could find that the first *Turner* factor had not been satisfied and concluded as a matter of law that NRADC's policy satisfied the first *Turner* factor. ECF No. 89 at 13.

8. The second *Turner* factor explicitly address "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner,* 482 at 90.

9. "Alternatives . . . need not be ideal, however; they need only be available." *Overton v. Bazatta,* 539 U.S. 126, 135 (2003). The Supreme Court has cautioned against a narrow interpretation of "the right" in question, finding that it must be "viewed sensibly and expansively." *Thornburgh v. Abbott,* 490 U.S. 401, 417 (1989).

10. PLN's corporate designee and HRDC executive director, Paul Wright, provided that PLN was able to communicate with individual inmates directly through mailed correspondence. (Tr. at 61:12 – 25; 67:17-19)

11. The old policy did not prohibit PLN from directly corresponding with potentially interested inmates via letter correspondence to make them aware of their publications. Those inmates could then request NRADC purchase a subscription or a particular book for the library carts. (Tr. at 85:5-8; 100:19-101:15; 111:19-22)

12. PLN could also correspond directly with the jail itself, and provide NRADC with a subscription for NRADC to make copies available to inmates. Neither PLN, nor any inmate ever requested that NRADC obtain a PLN subscription or provide PLN publications to inmates. (Tr. at 99:25 – 101:15)

13. Both options, while arguably not "ideal" to PLN, were viable alternative means for PLN to provide inmates at NRADC with its written materials.

Case 5:15-cv-00061-EKD-JCH   Document 116   Filed 12/14/18   Page 9 of 13   Pageid#: 1313

14. The third *Turner* factor addresses the impact on security, staff, inmates, and the allocation of resources. *Turner,* 482 U.S. at 90 (1987).

15. Prior to the new policy's implementation, NRADC expended a great amount of resources reviewing the voluminous number of periodicals, books, and magazines that the inmates received. Cell searches were also lengthy given the amount of material inmates were allowed to accumulate. NRADC expended substantial resources to searching inmate cells and closely monitoring books, magazines, and periodicals that came directly from publishers (Tr. at 81:6- 82:18; 91:9-92:11; 122:14 – 123:17; 130:15 – 131:4).

16. The new mail policy alleviated some of NRADC's safety concerns and made cell searches quicker and more effective. After the policy went into effect, NRADC did not receive a single complaint about the policy from any inmate. (Tr. at 64: 12 – 24; 103:2-4; 123:21 – 124:20).

17. Under the fourth *Turner* factor, the plaintiff bears the burden of providing an easy alternative that "fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests." *Turner,* 482 U.S. at 91.

18. The parties agreed by consent to revise the mailing policy: Northwestern Regional Jail Standard Operating Procedure # 5.12. Pursuant to this new policy, however, NRADC must continue to engage in practices that were penological concerns to Superintendent Whitley.

19. Under the new policy, NRADC staff must continue to inspect mailings for contraband and while inmate personal materials may decrease under the new policy, cell searches still include searching written materials that are not provided by the jail and are not labeled as NRADC property. (Tr. at 110:6-8; 133:14 – 134:4)

20. The facts therefore establish that NRADC's April 2014 mailing policy did not violate PLN's First Amendment rights pursuant to *Turner*.

**Compensatory Damages**

1. "[T]he basic purpose of § 1983 damages is *to compensate persons for injuries* that are caused by the deprivation of constitutional rights." *Memphis Cmnty. Sch. Dist. V. Stachura*, 477 U.S. 299, 307 (1986) (emphasis in original) (internal quotations omitted).

2. Compensatory damages "include not only out-of-pocket loss and other monetary harms,

but also such injuries as 'impairment of reputation…, personal humiliation, and mental anguish and suffering.'" *Id.* At 307.

3. Any compensatory damages associated with an established violation of a plaintiff's constitutional rights must be proved. *Carey v. Piphus*, 435 U.S. 247, 266–67 (1978); *Burt v. Abel*, 585 F.2d 613, 616 (4th Cir. 1978); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974) ("all awards [of compensatory damages] must be supported by competent evidence concerning the injury").

4. PLN never provided, through discovery or at trial, any evidence of monetary damages it suffered as a result of the mail policy. (*See*, Tr. at 60:17 - 61:9)

5. "A plaintiff's failure to prove compensatory damages results in nominal damages, typically one dollar…the rationale for the award of nominal damages being that federal courts should provide some marginal vindication for a constitutional violation." *Price v. City of Charlotte, N.C.*, 93 F.3d 1241, 1246 (4th Cir. 1996) (citing *Carey*, 435 U.S. at 266-67).

6. Section 1983 is grounded in "the principles of tort damages." *Stachura*, 477 U.S. at 308.

7. No compensatory damages can be awarded for violation of a constitutional right absent proof of actual injury. *Stachura*, 477 U.S. at 308 (citing *Carey*, 435 U.S., at 264).

8. Damages that "focus, not on compensation for a provable injury, but on the jury's subjective perception of the importance of constitutional rights as an abstract matter … [are] impermissible." *Stachura*, 477 U.S. at 308.

9. PLN never provided any evidence of actual injury as a result of the initial mail policy. Paul Wright testified, during his deposition and at trial, that it is solely up to the jury to put a value on the injuries PLN sustained. (Tr. at 60:11-16).

10. Injury to a constitutionally protected interest "can be compensated with substantial damages only to the extent that it is 'reasonably quantifiable'; damages should not be based on the 'so-called inherent value of the rights violated.'" *Piver v. Pender Cty. Bd. Of Educ.*, 835 F.2d 1076, 1082 (4th Cir. 1987) (quoting *Stachura*, 477 U.S. at 315).

11. "The award must focus on the real injury sustained and not on either the abstract value of the constitutional right at issue…or the importance of the right in our system of

government." *Piver*, 835 F.2d at 1082 (internal quotations omitted).

12. Supreme Court precedent "makes clear that nominal damages, and not damages based on some undefinable 'value' of infringed rights, are the appropriate means of 'vindicating' rights whose deprivation has not caused actual, provable injury." *Stachura*, 477 U.S. at 308, n. 11 (quoting *Carey*, 435 U.S., at 266).

13. "Lost opportunity to communicate" with potential or future subscribers is akin to assigning an inherent value to a constitutional right rather than to a compensable injury, and "does not involve the traditional tort damages that the *Stachura* Court highlighted." *Prison Legal News v. Babeu,* 933 F. Supp. 2d 1188, 1213 (D. Ariz. 2013).

14. Consequently, "lost opportunity to communicate" with potential or future subscribers cannot support a claim for compensatory damages.

15. Paul Wright's testimony concerns only abstract, nebulous damages as to PLN's ability to communicate with inmates, suppression of speech "in general," and frustration of PLN's mission. (Tr. at 44:17 – 45:5).

16. Paul Wright testified to abstract claims as to the frustration of its mission, but neither Mr. Wright nor PLN produced any specific evidence at trial related to these assertions. PLN was unable to produce any quantifiable damages as to how its mission had been frustrated, or any evidence to support a finding that its mission was "frustrated" in this case. (Tr. at 59:15 – 61:3)

17. Paul Wright included "diversion of resources" as a perfunctory response when questioned as to PLN's damages. He was unable to provide specifics about PLN's diversion of resources or staff time as a result of NRADC's mail policy, nor could he quantify any damages to diversion of PLN's resources. (Tr. at 59:15-23).

18. Mr. Wright provided cursory trial testimony pertaining to a chilling of PLN's speech "generally," (Tr. at 73:4 – 74:2).

19. Again, PLN offer no evidence specific to the damages related to its "lost opportunity to communicate" with its target audience and Mr. Wright simply mentions a restriction on ability to communicate with inmates during his recitation of PLN's damages. (Tr. at 59:17-19).

20. PLN produced only undefinable and abstract deprivations of its rights. No quantifiable damages have been established for any of the returned mailings.

21. Because Plaintiff failed to submit competent evidence supporting actual injury or reasonably quantifiable damages, Plaintiff has not established that it is entitled to any compensatory damages and at best is entitled only to an award of nominal damages in the amount of $1.00 for the violation of their due process rights.

<u>ORDER</u>

1. The Court declares that the NRADC April 1, 2014 mail policy did not violate Prison Legal News's First Amendment Rights.

2. Prison Legal News has failed to submit evidence supporting its claim of actual injury or reasonably quantifiable damages and has failed to establish that it is entitled to any compensatory damages.

3. Prison Legal News shall be awarded $1.00 in nominal damages for the violation of its due process rights.

Dated _____, 2018

_____
Elizabeth K. Dillon
United States District Court Judge