CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

9/30/2019

JULIA C. DUDLEY, CLERK
BY: s/ J. Vasquez

DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

PRISON LEGAL NEWS,                          )
                                            )
      Plaintiff,                      )
                                            )
v.                                          )      Civil Action No. 5:15-cv-00061
                                            )
NORTHWESTERN REGIONAL JAIL                  )      By: Elizabeth K. Dillon
AUTHORITY, *et al.*,                        )           United States District Judge
                                            )
      Defendants.                     )

**MEMORANDUM OPINION**

This case involves constitutional challenges brought by publisher Prison Legal News (PLN) after materials it sent to prisoners at the Northwestern Regional Adult Detention Center (NRADC) were sent back to it at PLN's expense with a notation that they had been refused, per jail policy. The named defendants are the Northwestern Regional Jail Authority (NRJA), which runs NRADC, jail superintendent James F. Whitley, and Captain Clay Corbin. Whitley was responsible for operations at the jail and approved the policy that PLN challenges; Corbin was the jail officer tasked with implementing the policy.

After this suit was filed, the parties engaged in settlement discussions. They subsequently provided to the court two consent decrees, both of which were entered by the court. Those orders effectively granted the injunctive relief sought by PLN in this suit.

On September 29, 2017, the court issued a Memorandum Opinion and an Order on cross-motions for summary judgment. (9/29/17 Mem. Op., Dkt. No. 89; 9/29/17 Order, Dkt. No. 90.) As a result of that ruling, the remaining issues to be resolved were whether PLN could prevail on its First Amendment claim against NRJA and the compensatory damages, if any, that PLN is entitled to as to its First Amendment claim in Count I and its due process claim in Count II.

(9/29/17 Mem. Op. 28.)   The court also dismissed Corbin from the case.   (9/29/17 Order.)[1]   In a

later order, the court granted summary judgment for defendants on PLN's equal protection claim.

(11/20/18 Mem. Op. & Order, Dkt. No. 101.)

On November 29, 2018, the court held a bench trial, after which the parties submitted

proposed findings of fact and conclusions of law.   Upon consideration of those submissions and

based on the evidence and testimony presented at trial, the court issues the following ruling.

## I.   BACKGROUND[2]

PLN is a publishing project of the non-profit Human Rights Defense Center (HRDC).

HRDC's Executive Director, Paul Wright, founded PLN as a prisoner within the Washington

Department of Corrections.   The core of PLN's mission is public education, advocacy, and

outreach to assist prisoners who seek legal redress for infringements of their constitutional and

human rights.

PLN publishes an award-winning, 72-page monthly magazine entitled *Prison Legal News*.

*Prison Legal News* provides information about legal issues affecting prisoners, including access to

courts, disciplinary hearings, prison and jail conditions, excessive force, and religious freedom.

In addition to *Prison Legal News*, PLN publishes and distributes legal and self-help softcover

books, including: (a) *The Habeas Citebook: Ineffective Assistance of Counsel* (*Habeas Citebook*),

which describes the procedural and substantive complexities of Federal habeas corpus litigation;

(b) *Protecting Your Health and Safety* (*PYHS*), which explains the basic rights of U.S. prisoners

with regard to communicable diseases, abuse, and other health and safety related issues; and (c)

---

[1]   Superintendent Whitley was dismissed from PLN's First Amendment claim.   NRJA remains the only
defendant as to First Amendment liability.   Superintendent Whitley remains a defendant as to PLN's due process
claim.

[2]   The following factual background constitutes the court's findings of fact under Rule 52(a) of the Federal
Rules of Civil Procedure.   *See* Fed. R. Civ. P. 52(a)(1) ("In an action tried on the facts without a jury or with an
advisory jury, the court must find the facts specially and state its conclusions of law separately.").

*Prisoner' Guerilla Handbook to Correspondence Programs in the United States & Canada* ("*PGH*"), a guide book to high school, vocational, paralegal, law, college and graduate courses available to prisoners.   PLN has a practice of mailing free copies of its publications to inmates it believes may be interested in its materials.   PLN also obtains inmate mailing lists from other organizations.

NRJA is a jail authority created by the City of Winchester, Virginia, and the counties of Clarke, Frederick, and Faquier.   NRADC is the name of the detention facility under the authority of, and operated by, NRJA and located in Frederick County, Virginia.   As of late November 2016, NRADC had approximately 650 inmates.   In fiscal year 2014, NRADC averaged 580 inmates. In fiscal year 2015, NRADC averaged 638 inmates.   While its population fluctuates, approximately 50% of the prisoners at the NRADC are pretrial detainees.

James Whitley has been the superintendent at the jail since 2012 and is the final decision maker with respect to all operational issues at the jail.   Clay Corbin is the former Captain of Security at NRADC.   In that role, Corbin collaborated with Whitley to establish security policies at the jail, including the institution of the former mail policy at issue in this case.

Prior to February 26, 2014, NRADC had a policy which allowed inmates to receive books, magazines, and other periodicals through the mail.   Superintendent Whitley reexamined NRADC's policy after receiving numerous reports that people were tampering with mailings sent to the jail in order to hide contraband.   In addition to inmates using books, magazines, and periodicals to smuggle contraband, Whitley was concerned about the number of books, magazines, and periodicals that inmates were accumulating in their cells.   NRADC expended a great amount of resources reviewing these items, and cell searches took much longer because of the amount of material inmates accumulated.

In February 2014, Superintendent Whitley instituted a new policy, effective April 1, 2014, that prohibited prisoners from receiving books or magazines "through the mail, directly from the publisher, or from a distribution source." Prior to the April 1, 2014 policy, inmates could possess one religious book, two educational books, and up to five additional soft-covered books. Inmates could also possess an unlimited number of magazines, although certain periodicals were altogether banned. The new policy stated that books and magazines would be provided by the programs section through the library cart and marked as property of NRADC. Each inmate would be allowed one book at a time, with an exception for religious or educational or educational books. Additionally, the carts would contain multiple copies of five specific magazines.

The reasons given by defendants for the new policy were that it was an effort to limit contraband (such as drugs) from coming into the jail, and to reduce the amount of personal property in a cell for purposes of cell searches. No contraband had ever been found in books, magazines, or other periodicals sent by a publisher or distributor. There were instances of contraband having been introduced into the jail through visits, letter correspondence, and/or work release. Defendants did not curtail visitation, letter correspondence, or work release. Defendants concede that greater prison resources are needed to monitor prisoner visitations than would be required to review incoming books and magazines for contraband, yet it did not eliminate visitations out of a concern that it would be unlawful to do so.

NRADC invested time and money expanding its library, ordering magazines directly from publishers, and rotating them in and out of the book carts each month. NRADC also purchased over one thousand new books following implementation of the new policy. Staff took inmate suggestions for magazines and books for the library cart. No inmate ever requested PLN publications be included on the library cart.

On or about April 1, 2014, counsel for PLN wrote a letter to Superintendent Whitley objecting to the new policy and asserting that it violated the First Amendment, with citations to legal authority. The letter did not indicate that counsel represented PLN specifically. Whitley emailed back that he would examine the issue. No further response was received from Whitley, as he forgot about the letter and did not discuss it with anyone.

In total, PLN mailed 236 magazines and books to individual prisoners at the NRADC subsequent to the implementation of the new April 1, 2014 policy. PLN had at least one paid prisoner subscriber, Mary Jenkins, who was in and out of defendants' custody in 2014. As a result of the policy banning publications, Ms. Jenkins did not receive PLN's publications. Wright testified that while Ms. Jenkins was the only paid subscriber identified at his deposition, he believed there were more paid subscribers at the facility during the prior mail policy.

Some of PLN's books and magazines were mailed back to PLN through the Return to Sender service of the United States Postal Service. From October 2014 to November 4, 2015, at least 170 issues of *Prison Legal News* were rejected by defendants.[3] From October 2014 to November 4, 2015, at least 16 copies of *The Habeas Citebook* were rejected by defendants. In November 2015, at least 25 copies of *PYHS* were rejected by defendants. From October 2014 to March 2016, at least three copies of *PGH* were rejected by defendants. A total of 44 books were returned to PLN. Many of the returned magazines and books bore the stamp "Against Jail Policy," indicating that defendants had rejected delivery of that mail item pursuant to the new April 1, 2014 policy. Even though PLN did not receive back every magazine or book that was mailed to the jail in that timeframe, defendants do not deny that every publication sent from PLN to prisoners at the NRADC between October 2014 and March 2016 would have been censored. PLN is the only publisher and distributor of *The Habeas Citebook*, *PYHS*, and *PGH* providing

---

[3] The purchase price of a single issue of *Prison Legal News* is $5.00.

prisoners at the NRADC with these books.[4]

In February 2016, the parties entered a consent order providing that senders of mail receive notice and an opportunity to be heard should their materials be rejected from being delivered to their intended prisoner recipients.   In March 2016, the parties entered a consent order that allows prisoners to order publications through the mail from publishers, subject to reasonable inspection and reasonable limitations on the number of publications permitted.   Subsequent to the entry of the consent orders, defendants initially limited the number of books and magazines a prisoner could have in their cell to reduce the time needed for cell searches or other perceived burdens on prisoner resources.   Defendants, however, soon thereafter increased the number of magazines and books a prisoner could have in his cell because the added time to review publications for inappropriate material (i.e. sexual images) or contraband was determined to be only a minimal burden on jail or staff resources.   According to Corbin, the consent order allowing deliveries of publications to prisoners was a win/win situation, serving both prisoners and the jail, and the minimal additional work involved in reviewing publications is warranted and does not create a serious problem with cell searches.   Notwithstanding a "fluke" incident involving an item of contraband inadvertently left by the previous owner of a used book, the jail has never experienced security threats from materials originating from a publisher or distributor.    Defendants believe that it is important for prisoners at the jail to have access to reading material.

Wright, HRDC's executive director, testified that defendants' April 2014 policy restricted PLN's "ability to communicate with our target audience."   Wright also testified that PLN's resources were diverted in order to investigate the rejection of its materials by defendants and in order to litigate this case, and PLN will need to expend resources at the end of this litigation to

---

[4] The purchase price for *The Habeas Citebook* is $49.95, $10.00 for *PYHS*, and $49.95 for *PGH*.   PLN's shipping and handling costs are $2.48 for *The Habeas Citebook*, $6.00 for *PYHS*, and $2.48 for *PGH*.

inform the community about defendants' unconstitutional policy and eradicate its effects.

Finally, Wright testified that prisoners were not going to subscribe to PLN's magazines if they were not going to be able to get it.

## II.  DISCUSSION

### A.  First Amendment Claim

This issue will turn on the court's application of the four-factor test in *Turner v. Safley*, 482 U.S. 78 (1987).   That is, to evaluate the constitutionality of a prison policy that impacts the First Amendment rights of prisoners (or publishers communicating with them), the court must look to the following factors:

> (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates" . . . ; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns."

*Lovelace v. Lee,* 472 F.3d 174, 200 (4th Cir. 2006) (quoting *Turner,* 482 U.S. at 89–92); *Thornburgh v. Abbott*, 490 U.S. 401, 404 (1989) (holding that prison regulations affecting a publisher's ability to send material to prisoners are valid if they are reasonably related to legitimate penological interests and directing courts to apply the *Turner* factors in this context).   The Supreme Court has since clarified that the first factor *must* be satisfied for the regulation to be upheld.   *Shaw v. Murphy*, 532 U.S. 223, 229–30 (2001) (explaining the first *Turner* factor and noting that "[i]f the connection between the regulation and the asserted goal is 'arbitrary or irrational,' then the regulation fails, irrespective of whether the other factors tilt in its favor"); *see also Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006) (describing the first factor as an

"'element' because it is not simply a consideration to be weighted but rather an essential requirement").

When applying the *Turner* factors, the court must "respect the determinations of prison officials," *United States v. Stotts,* 925 F.2d 83, 86 (4th Cir. 1991), and "must accord deference to the officials who run a prison, overseeing and coordinating its many aspects, including security, discipline, and general administration." *Lovelace,* 472 F.3d at 199. That is, the court must accord "substantial deference to the professional judgment of prison administrators, who bear significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). As the court explained in its memorandum opinion denying cross-motions for summary judgment on this issue, "analyzing First Amendment claims challenging prison regulations is a highly fact-specific exercise." *Prison Legal News v. Nw. Reg'l Jail Auth.*, Civil Action No. 5:15-cv-00061, 2017 WL 4415659, at *5 (W.D. Va. Sept. 29, 2017).

In its summary judgment opinion, the court found that no reasonable fact finder could conclude that the first factor—a rational connection between the regulation and the interest asserted—is not satisfied. *Id.* Now sitting as a fact finder, upon consideration of the evidence presented at trial, the court finds that there is a rational connection between NRADC's April 1, 2014 policy and the interests asserted. The reasons advanced for implementing the policy were to control contraband and to reduce the amount of inmate personal property. "Certainly, the April 2014 policy was rationally connected to the goal of reducing inmate personal property. It significantly limited the number of books an inmate could have (to only pre-approved religious or educational books), and restricted prisoners altogether from owning or possessing magazines or taking them into their cells." *Id.* PLN argues that the consent order that now allows deliveries of

publications to prisoners has not created a serious problem with cell searches.   In hindsight, this

may have proven true, but due regard to the professional judgment of jail administrators leads the

court to conclude that limiting the amount of property kept by inmates in their cells is a legitimate

penological interest, and the April 2014 policy was rationally related to that interest.   Regarding

contraband, PLN argues that items sent directly from publishers are unlikely to contain drugs.

*See HRDC v. Sw. Va. Reg'l Jail Auth.*, Case No. 1:18CV00013, 2018 WL 3239299, at *5 (W.D.

Va. July 3, 2018).   But as the court explained in its summary judgment ruling, and as the trial

record shows, Superintendent Whitley received numerous reports that people were tampering with

mailings sent to the jail in order to hide contraband.   "Allowing only a limited number of the same

type of magazine, addressed to the jail rather than to any individual prisoner, is rationally

connected to the security goal of preventing periodicals from being tampered with to introduce

contraband."   *Prison Legal News*, 2017 WL 4415659, at *5.   The absence of evidence indicating

that contraband has been introduced to NRADC in this manner does not preclude a finding that the

policy is rationally related to the prison's interest in controlling contraband.   *See id.* at *5 n.4

("Although PLN emphasizes that the reports were 'unverified,' it offers no authority for the

proposition that jail officials must have concrete evidence that a particular problem has occurred.

Other courts have rejected such a requirement.") (citing *Prison Legal News v. Jones*, No.

4:12-cv-239, 2015 WL 12911752, at *16 (N.D. Fla. Oct. 5, 2015)).

Also in its summary judgment opinion, the court found that the second factor—whether

there is an alternative means for PLN to exercise its rights—clearly favors PLN.   *Id.* at *6.   The

court now finds the same.   The policy left alternative means open to inmates to exercise their First

Amendment rights, but "it did not leave any such means open to PLN.   Indeed, the policy was

effectively a complete ban on any prisoner being able to obtain PLN publications, whether through

a subscription or a gift subscription." *Id.* Further, the alternative offered to inmates was access to books from a library cart and copies of five different magazines chosen by NRADC, none of which are PLN. "Thus, it appears that PLN is being denied total access to the prisoners at the jail and does not have an adequate alternative method for reaching prisoners." *Id.*

NRADC contends that PLN could have provided NRADC with a subscription to make copies available for inmates. Also, PLN could have directly corresponded with inmates to make them aware of their publications, and the inmates, in turn, could have asked NRADC to purchase a subscription or a book for the library carts. However, there is no evidence that the option to request a subscription was known by or communicated to the prison population. Moreover, *Prison Legal News* is the primary conduit through which PLN communicates its written speech with prisoners. This right exists independent of the prisoner's right to receive such information. *See Hrdlicka v. Reniff*, 631 F.3d 1044, 1049 (9th Cir. 2011) ("A First Amendment interest in distributing and receiving information does not depend on a recipient's prior request for that information."). For these reasons, the alternative means factor favors PLN.

The third *Turner* factor addresses the impact on security, staff, inmates, and the allocation of resources. *Turner*, 482 U.S. at 90. Prior to implementation of the April 2014 policy, NRADC expended a great amount of resources reviewing periodicals, books, and magazines that the inmates received. Cell searches were also lengthy given the amount of material inmates accumulated. Similarly, the consent decree policy requires more work up front to review incoming publications. There were costs associated with the April 2014 policy, however, as NRADC spent a large amount of money to purchase books and magazines to make them available to inmates. After the entry of the consent orders, defendants initially limited the number of books and magazines a prisoner could have in his cell, but later increased that amount because they found

that the added time to review publications for inappropriate material was only a minimal burden on jail or staff resources. Defendants also concede the importance of reading material for inmates, the availability of which was limited by the April 2014 policy. On balance, the court finds that the third factor favors PLN.

Under the fourth *Turner* factor, PLN bears the burden of providing an easy alternative that "fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests." *Turner*, 482 U.S. at 91. The consent order, the operation of which was described by Corbin as a "win/win" for prisoners and the jail, is such an accommodation. (*See* Pl.'s Proposed Findings of Fact and Conclusions of Law, ¶ 39, Dkt. No. 115.)

For these reasons, the court finds that PLN has demonstrated that defendants' policy of banning all books and magazines mailed to prisoners at NRADC violated its First Amendment rights.

## B. Damages

The "purpose of § 1983 is to compensate a plaintiff whose constitutional rights have been violated; to recover compensatory damages for such violations, a plaintiff must suffer actual, demonstrable injury." *Price v. City of Charlotte*, 93 F.3d 1241, 1246 (4th Cir. 1996). Section 1983 creates "a species of tort liability," *Carey v. Piphus*, 435 U.S. 247, 253 (1978), and therefore, "when § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306 (1986). "To that end, compensatory damages include not only out-of-pocket loss and other monetary harms, but also such injuries as 'impairment of reputation . . . , personal humiliation, and mental anguish and suffering." *Id.* at 307. When a plaintiff "seeks compensation for an injury that is likely to have occurred but

difficult to establish, some form of presumed damages may possibly be appropriate. In those circumstances, presumed damages may roughly approximate the harm that the plaintiff suffered and thereby compensate for harms that may be impossible to measure." *Stachura*, 477 U.S. at 310–11. By contrast, damages based on "the abstract 'value' or 'importance' of constitutional rights are not a permissible element of compensatory damages." *Id.* at 310. Absent proof of actual injury or compensatory damages, the court is limited to awarding a plaintiff nominal damages. *See Farrar v. Hobby*, 506 U.S. 103, 112 (1992); *Williams v. Griffin*, 952 F.2d 820, 825 n.2 (4th Cir. 1991).

The measure of damages under Section 1983 "must be based on the interests designed to be protected by the right that was violated; it is not a simple matter of applying damage formulas from tort law, or quantifying out-of-pocket expense." *Piver v. Pender Cnty. Bd. of Educ.*, 835 F.2d 1076, 1082 (4th Cir. 1987) (citing *Carey*, 435 U.S. at 258). An award of substantial compensatory damages, as opposed to nominal damages, must be "proportional to the actual injury incurred." *Id.* Injury to a protected First Amendment interest, for example, can constitute compensable injury "wholly apart from any 'emotional distress, humiliation and personal dignity, emotional pain, embarrassment, fear, anxiety and anguish' suffered by plaintiffs." *Id.* (quoting *Stachura*, 477 U.S. at 315 (Marshall, J., concurring)). However, such an injury can only be compensated with substantial damages to the extent that it is "reasonably quantifiable;" damages should not be based on the "so-called inherent value of the rights violated." *Piver*, 835 F.2d at 1082 (citing *Stachura*, 477 U.S. at 315 (Marshall, J., concurring)).

### 1. First Amendment damages

#### a. Cost damages

PLN requests "cost damages" in the amount of $2,301.17. PLN arrives at this amount by

taking the retail price of the publications, adding the shipping and handling costs, and multiplying

that amount by the number of returned mailings. Unless PLN is selling its publications for

exactly as much as they cost to make, retail price is not a reliable indicator of the actual cost of

PLN's publications. Even if it were, most of the items were sent as unsolicited gifts, and most of

those items were returned to PLN. Aside from shipping costs (set forth below), this basically

placed PLN in the same position it would have been if the violation had never occurred. The

returned books or magazines could have been sent or sold to inmates at a different jail or prison.

Ultimately, because PLN did not provide any hard cost calculations, the court rejects the retail

price aspect of PLN's proposed cost damages as unreliable. The court will, however, award

shipping and handling costs as follows:

| Type of publication | Shipping and handling costs | Number censored by jail | Cost damages |
|---|---|---|---|
| *The Habeas Citebook* | $2.48 | 16 | $39.68 |
| *PYHS* | $6.00 | 25 | $150.00 |
| *PGH* | $2.48 | 3 | $7.44 |
| | | | Total:  $197.12 |

    *b.  "Presumed" damages*

PLN requests presumed damages of $200 for each of the 236 items[5] mailed to and rejected

by defendants, for a total of $47,200.00. As noted above, presumed damages may "roughly

approximate the harm that the plaintiff suffered and thereby compensate for harms that may be

impossible to measure." *King v. Zamiara*, 788 F.3d 207, 213 (6th Cir. 2015) (quoting *Stachura*,

---

[5] There is some confusion in the record of this case about the number of returned or "censored" books and magazines. PLN's proposed findings of fact state that it "mailed 236 magazines and books to individual prisoners at the NRADC subsequent to the implementation of the new April 1, 2014 policy." (Pl.'s Proposed Findings of Fact and Conclusions of Law, ¶ 24.) The stipulated breakdown of "rejected items" only totals 225 items. (*Id.* ¶¶ 29–30.) PLN requested "cost damages" above based on the stipulated breakdown, but now reverts to 236 items for presumed damages. Defendants do not dispute the use of either number, and the court also notes that defendants do not deny that every publication sent from PLN to prisoners at the NRADC between October 2014 and March 2016 would have been censored. (*Id.* ¶ 33.) For purposes of this analysis, therefore, the court will use 236 items as the basis for its calculation.

477 U.S. at 311).

PLN argues that it is entitled to damages due to the lost opportunity to communicate with its intended audience of prisoners, diversion of resources, frustration of mission, and reputational damage. The court understands that damages in this context can be difficult to measure, but PLN offers little more than speculative testimony in its effort to "roughly approximate" the harm that was suffered. For example, PLN states that defendants' actions caused it to divert time and resources to investigate the nature and extent of defendants' policies and censorship practices, as well as to litigate the matter before the court. PLN offers no way to measure or quantify the extent of the diversion. Similarly, PLN argues that it will need to expend resources to educate the community and eradicate the adverse effects of defendants' unconstitutional actions, but the extent of such efforts are left unstated.

That said, the court can grasp that each rejected item—all 236 of them—constitutes a separate First Amendment violation and represents, as PLN states, a lost opportunity to communicate with its intended audience of prisoners. These lost opportunities strike at the core of PLN's mission to educate, inform, and assist prisoners. The question is whether PLN is entitled to anything more than nominal damages for these violations. Instead of $200 per item,[6] which the court considers far too high, the court will award $2.00 per item, for a total award of $472.00. This amount, twice as much as the typical nominal damage award of $1.00, combined with the multiplying effect of so many violations, constitutes a rough approximation of the damage suffered by PLN.

---

[6] PLN cites cases involving awards between $500 and $1,500 for each piece of mail unlawfully blocked by jail authorities, but these cases are distinguishable because the awards included punitive damages, and the court previously held that PLN is not entitled to punitive damages in this case. *See, e.g.*, *Williams v. Brimeyer*, 116 F.3d 351, 352 (8th Cir. 1997) (upholding jury award of $500 in punitive damages and $1.00 in nominal compensatory damages). Additionally, in the cases awarding more than nominal damages, the amount of the award for compensatory damages was either not at issue on appeal or subject to little or no discussion. *See id.* at 880.

## 2. Due process damages

In its summary judgment ruling, the court found that PLN's due process rights were violated pursuant to case law establishing that "publishers are entitled to notice and an opportunity to be heard when their publications are disapproved for receipt by inmate subscribers." *Montcalm Publ'g Co. v. Beck*, 80 F.3d 105, 106 (4th Cir. 1996); *Prison Legal News*, 2017 WL 4415659, at *12. PLN requests $50 per item in nominal damages for each rejected item, but the court once again considers that amount too high. Instead, for the same reasons stated in the previous section, the court will award $2.00 per item, for a total award of $472.00.

## III. CONCLUSION

For the above-stated reasons, the court concludes that NRADC's April 1, 2014 policy prohibiting prisoners from receiving books or magazines "through the mail, directly from the publisher, or from a distribution source" violated PLN's First Amendment rights.

The court further finds that PLN is entitled to $669.12 in compensatory damages for the First Amendment violation: $197.12 in cost damages, and $472.00 in presumed damages.

The court also finds that PLN is entitled to $472.00 in compensatory damages for the due process violation.

Finally, the court finds that PLN is entitled to a declaration that NRADC's April 1, 2014 policy violated PLN's rights under the First and Fourteenth Amendments.

The court will enter an appropriate order.

Entered: September 30, 2019.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge